17-1993-cv (L)
*New York v. United Parcel Service, Inc.*

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

August Term, 2018

Argued: March 8, 2019     Decided: November 7, 2019

Docket Nos. 17-1993-cv; 17-2107-cv; 17-2111-cv

THE STATE OF NEW YORK, THE CITY OF NEW YORK,

*Plaintiffs-Appellees - Cross-Appellants*,

— v. —

UNITED PARCEL SERVICE, INC.,

*Defendant-Appellant - Cross-Appellee.*

B e f o r e:

JACOBS and LYNCH, *Circuit Judges*, and VILARDO, *District Judge.*[*]

---

[*] Judge Lawrence J. Vilardo, of the United States District Court for the Western District of New York, sitting by designation.

In this civil action, filed in the United States District Court for the Southern District of New York (Forrest, *J.*), the State and City of New York charged UPS with violating the Contraband Cigarette Trafficking Act, 18 U.S.C. 2341 *et seq.*, the Prevent All Cigarette Trafficking Act, 15 U.S.C. 375 *et seq.*, and New York Public Health Law 1399-*ll*, as well as breaching its settlement agreement (the "Assurance of Discontinuance") with the New York State Attorney General. After a bench trial, the district court found that UPS had violated its obligations under the Assurance of Discontinuance in a number of respects and also knowingly transported contraband cigarettes from its shipper-customers on Native American reservations to consumers throughout the State and City in violation of several statutes. The district court ordered UPS to pay $9.4 million in unpaid cigarette taxes and $237.6 million in total penalties to the plaintiffs. UPS appeals from that judgment, arguing that the district court erred in both its liability and damages rulings. The State and City cross-appeal from aspects of the damages rulings. We AFFIRM the district court's liability rulings, MODIFY the damage and penalty awards, and AFFIRM the judgment as modified.

Judge Jacobs concurs in part and dissents in part in a separate opinion.

––––––––––––

STEVEN WU, Deputy Solicitor General, State of New York, (Eric T. Schneiderman, Attorney General, State of New York, Barbara D. Underwood, Solicitor General, State of New York, Eric Del Pozo, Assistant Solicitor General of Counsel, State of New York, *on the brief) for Plaintiff-Appellee - Cross-Appellant State of New York.*

RICHARD DEARING, Chief, Appeals Division, Corporation Counsel, City of New York, (Zachary W. Carter, Corporation Counsel, City of New York, Claude S. Platton, Deputy Chief, Appeals Division, Corporation Counsel City of New York, Jeremy W. Schneider, Senior Counsel, Appeals Division of Counsel, Corporation Counsel, City of New York, *on the brief) for Plaintiff-Appellee - Cross-Appellant City of New York.*

MARK A. PERRY, Gibson, Dunn & Crutcher LLP, Washington, D.C., (Christopher J. Baum, Aidan Taft Grano, Gibson, Dunn & Crutcher LLP, Washington, D.C., Caitlin J. Halligan, Gibson, Dunn & Crutcher LLP, New York, NY, Deanne E. Maynard, Morrison & Foerster, LLP, Washington, D.C., Paul T. Friedman, Morrison & Foerster, LLP, San Francisco, CA, *on the brief*) *for Defendant-Appellant - Cross-Appellee.*

Barry S. Schaevitz, Beth G. Oliva, Oksana G. Wright, Fox Rothschild LLP, New York, NY, *for Amicus Curiae* Cigar Association of America, Inc.

Richard Pianka, ATA Litigation Center, Arlington, VA, *for Amicus Curiae* American Trucking Associations, Inc.

Kimo S. Peluso, Heather Yu Han, Sher Tremonte LLP, New York, NY, *for Amici Curiae* Campaign for Tobacco-Free Kids, American Cancer Society Cancer Action Network, American Lung Association, New York State American Academy of Pediatrics, Chapters 2 & 3, Public Health Law Center at the Mitchell Hamline School of Law, and Truth Initiative Foundation.

Nora Flum, Deputy Attorney General, California, Xavier Becerra, Attorney General, California, Karen Leaf, Senior Assistant Attorney General, California, Samuel P. Siegel, Associate Deputy Solicitor General, California, George Jepsen, Attorney General of Connecticut, Russell A. Suzuki, Acting Attorney General of Hawai'i, Lisa Madigan, Attorney General of Illinois, Curtis T. Hill, Jr., Attorney General of Indiana, Thomas J. Miller, Attorney General of Iowa, Brian E. Frosh, Attorney General of Maryland, Maura Healey, Attorney General of Massachusetts, Bill Schuette, Attorney General of Michigan, Gurbir S. Grewal, Attorney General of New Jersey, Ellen F. Rosenblum, Attorney General of Oregon,

Josh Shapiro, Attorney General of Pennsylvania, Alan Wilson, Attorney General of South Carolina, Sean D. Reyes, Attorney General of Utah, Thomas J. Donovan, Jr., Attorney General of Vermont, Mark R. Herring, Attorney General of Virginia, Robert W. Ferguson, Attorney General of Washington, Peter K. Michael, Attorney General of Wyoming, Karl A. Racine, Attorney General of the District of Columbia, Wanda Vázquez Garced, Attorney General of Puerto Rico, *for Amici Curiae* California, Connecticut, Hawai'i, Illinois, Indiana, Iowa, Maryland, Massachusetts, Michigan, New Jersey, Oregon, Pennsylvania, South Carolina, Utah, Vermont, Virginia, Washington, Wyoming, the District of Columbia, and Puerto Rico.

Leslie Rutledge, Arkansas Attorney General, Nicholas Bronni, Deputy Solicitor General, Arkansas, Jeff Landry, Attorney General of Louisiana, Elizabeth B. Murrill, Solicitor General, Arkansas, Patricia H. Wilton, Deputy Solicitor General, Arkansas, *for Amici Curiae* Louisiana, Arkansas, and Kentucky.

Jeffrey S. Bucholtz, King & Spalding LLP, Washington, D.C., Merritt E. McAlister, Val Leppert, King & Spalding LLP, Atlanta, GA, Warren Postman, U.S. Chamber Litigation Center, Inc., Washington, D.C., *for Amicus Curiae* Chamber of Commerce of the United States of America.

Cory L. Andrews, Richard A. Samp, Washington Legal Foundation, Washington, D.C., *for Amicus Curiae* Washington Legal Foundation.

GERARD E. LYNCH, *Circuit Judge*:

In this civil action, filed in the United States District Court for the Southern District of New York (Katherine B. Forrest, *Judge*), the State and City of New York (collectively "plaintiffs") charged UPS with violating the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. 2341 *et seq.*, the Prevent All Cigarette Trafficking Act ("PACT Act"), 15 U.S.C. 375 *et seq.*, and New York Public Health Law ("PHL") 1399-*ll*, as well as with breaching its settlement agreement (the "Assurance of Discontinuance" or "AOD") with the New York State Attorney General ("NYAG"). After a bench trial, the district court found that UPS had violated its obligations under the Assurance of Discontinuance in a number of respects, and knowingly transported contraband cigarettes from its shipper-customers on Native American reservations to consumers throughout the State and City in violation of several statutes. The district court ordered UPS to pay $9.4 million in unpaid taxes and $237.6 million in total penalties to the plaintiffs. UPS appeals from that judgment, arguing that the district court erred in both its liability and damages rulings; the plaintiffs cross-appeal from aspects of the damages rulings. For the reasons explained below we AFFIRM the district court's

liability rulings, MODIFY the damage and penalty awards, and AFFIRM the

judgment as modified.

## TABLE OF CONTENTS

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.      Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.     The State's and City's Cigarette Taxation Regime. . . . . . . . . . . . . . . 7

        B.     Tax Evasion in the State and City. . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.     The NYAG's First Investigation of UPS. . . . . . . . . . . . . . . . . . . . . 13

        D.     The NYAG's Second Investigation of UPS.. . . . . . . . . . . . . . . . . . . 16

    II.     The Federal Regulatory Regime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.     The Contraband Cigarette Trafficking Act. . . . . . . . . . . . . . . . . . . 17

        B.     The Prevent All Cigarette Trafficking Act. . . . . . . . . . . . . . . . . . . 18

    III.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        A.     The Complaint Against UPS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        B.     Pre-Trial Motion Practice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        C.     UPS's Rule 26 Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        D.     The District Court's Liability Opinion. . . . . . . . . . . . . . . . . . . . . 37

        E.     The District Court's Damages and Penalties Opinion. . . . . . . . . . . 47

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    I.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    II.     The Liability Theories. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

        A.     UPS Did Not Honor the AOD and is Therefore Subject to Liability Under the PACT Act and PHL § 1399-*ll*.. . . . . . . . . . . . . . . . . . . . 52

        B.     UPS is Liable for Violations of the AOD's Audit Requirement.. . . . 71

    C.      UPS Violated the CCTA by Knowingly Transporting More Than 10,000 Unstamped Cigarettes.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

III.    The Damages and Penalties Awards. . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

    A.      The District Court Did Not Abuse Its Discretion in Allowing the Plaintiffs to Present Their Damages Case Nor Did It Clearly Err in Making Factual Findings Based on Record Evidence.. . . . . . . . . . . . 83

        1.      The District Court Reasonably Refused to Strike the Plaintiffs' Entire Damages and Penalties Case.. . . . . . . . . . . . . . . . . . . . . . . 84

        2.      The District Court's Factual Findings on Damages and Penalties Were Supported by the Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . 88

            (i)     Package Quantity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

            (ii)    Package Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

        3.      The District Court Did Not Err By Ordering the Parties to Submit Post-Trial Calculations of Damages and Penalties.. . . . . . . . . . . 95

    B.      The District Court Erred in Awarding the Plaintiffs Only Half of the Unpaid Taxes on Cigarettes UPS Unlawfully Shipped.. . . . . . . . . . 98

    C.      The District Court Abused Its Discretion in Awarding Per-Violation Penalties Under Both the PACT Act and PHL § 1399-*ll*.. . . . . . . . . 104

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

**BACKGROUND**

## I.    Factual Background

### A.    The State's and City's Cigarette Taxation Regime

The deleterious effects of cigarette smoking and the associated public health costs are enormous. Tobacco use kills almost 30,000 people per year in New York, exceeding the number of deaths caused by alcohol, motor vehicle

accidents, firearms, and toxic agents combined. Tobacco-related health care costs New Yorkers $10.4 billion annually. Thus, like the federal government, New York State (the "State") and New York City (the "City") impose excise taxes on cigarettes in order to discourage cigarette smoking and defray some of the health care costs it causes. Those public policy goals, obviously, can be achieved only insofar as the taxes are actually paid.

The State first instituted an excise tax on cigarettes in 1939. N.Y. Tax Law § 471 (1939). The law requires a tax to be imposed on "all cigarettes possessed in the state by any person for sale" except when the "state is without power to impose such tax." *Id*. The law presumes that all cigarettes possessed for sale or use are taxable, unless an exemption applies. *See id.*; 20 N.Y.C.R.R. § 76.1(a)(1).

Taxable cigarettes must bear a stamp evidencing payment of the tax. N.Y. Tax Law § 471; N.Y.C. Admin. Code § 11–1302(g). New York's Department of Taxation and Finance ("DTF") "precollects" the tax from a limited number of state-licensed stamping agents, who buy and affix tax stamps to each pack of cigarettes, and incorporate the value of the tax into the sale price of the cigarettes, thereby passing the tax along to each subsequent purchaser in the distribution chain and, ultimately, to the consumer. *See* Tax Law § 471(2); 20 N.Y.C.R.R.

8

§§ 74.2–74.3; N.Y.C. Admin. Code § 11–1302(g)–(h); *see also Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 158 (2d Cir. 2011) (discussing licensed stamping agents' pivotal role in state taxation scheme). Given this regulatory regime, it is immediately apparent that the tax has not been paid on cigarettes not bearing stamps ("unstamped cigarettes").

Both the State's and City's excise taxes on cigarettes increased significantly in the 2000s. At nearly all times relevant to this appeal, the State's excise tax was $4.35 per pack of cigarettes,[1] *see* Tax Law § 471(1); 20 N.Y.C.R.R. § 74.1(a)(2), and the City's excise tax was $1.50 per pack, *see* N.Y.C. Admin. Code § 11–1302.[2] The combination of State, City, and Federal cigarette taxes meant that by July 2010, the taxes on a pack of cigarettes were $6.86 in New York City and $5.36 in the rest of the State.

## B. Tax Evasion in the State and City

The cigarette tax has always posed thorny issues for the sale of cigarettes on Native American reservations. Federal law prohibits New York from

---

[1] The tax was increased to $4.35 from $2.75 on July 1, 2010. *See* N.Y. Tax Law § 471; 2010 Sess. Laws News of N.Y. Ch. 134 (A. 11515).

[2] Accordingly, for each carton of cigarettes (which typically contains 10 packs of cigarettes), the State excise tax rate is $43.50 per carton, and the City excise tax rate is $15.00 per carton.

9

imposing taxes on the sale of cigarettes to tribal members on their own reservation for personal use. *See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 475–81 (1976). New York is permitted, however, to tax the sale of cigarettes from reservation sellers to non-tribal members. *See Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 64 (1994). In 2010, § 471(1) was amended to state explicitly that "sales to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation" are exempt from the State's taxation scheme. However, it also made explicit that the tax *should* be collected on "all cigarettes sold on an Indian reservation to non-members of the Indian nation or tribe and to non-Indians." N.Y. Tax Law § 471(1).

The sale of both taxable and tax-free cigarettes on reservations has complicated the State's ability to enforce the tax law and collect the taxes due.[3] *See Oneida Nation*, 645 F.3d at 158. Reservation sellers' refusal to participate in the tax stamping system for the collection of cigarette taxes has amplified the

---

[3] New York State's DTF entered a public "forbearance" policy, which was in effect from at least the mid-1990's until February 2010, pursuant to which it did not enforce tax regulations governing on-reservation sales of cigarettes to non-Native Americans.

problem. *See id*. at 159–161.

In the 1980s, New York State's DTF determined that the volume of untaxed cigarettes that reservation retailers sold "would, if consumed exclusively by tax-immune Indians, correspond to a consumption rate 20 times higher than that of the average New York resident." *Milhem Attea*, 512 U.S. at 64–65. In other words, either Native Americans were smoking an extraordinary number of cigarettes, or a substantial number of non-Native American New Yorkers were purchasing their cigarettes from reservation retailers without paying the relevant taxes. *See Oneida Nation*, 645 F.3d at 158–59. DTF estimated that it was losing approximately $65 million a year in tax evasion, in substantial part due to non-tribal members purchasing unstamped cigarettes from reservation sellers. *Id.* at 159. A more recent study concluded that 60% of the cigarettes consumed in New York were subject to tax evasion, resulting in an estimated loss of tax revenue exceeding $2 billion annually.[4]

In 2000, in response to this alarming level of sales of unstamped cigarettes, New York's Legislature enacted PHL § 1399-*ll* which effectively requires that all

---

[4] RTI Int'l, 2014 Independent Evaluation Report of the New York Tobacco Control Program 25 (2014), https://www.health.ny.gov/ prevention/tobacco_control/docs/2014_independent_evaluation_report.pdf.

11

cigarette sales in New York be made face-to-face. The law was specifically targeted to combat the "shipment of cigarettes sold via the internet or by telephone or mail order to residents of this state." Act of June 14, 2000, § 1, 2000 N.Y. Laws 2905, 2905. It imposes liability on both sellers of cigarettes and common carriers for shipping cigarettes in violation of the statute.

Specifically, the statute makes it illegal for cigarette sellers to ship cigarettes to any person in New York—regardless of whether the excise taxes have been paid—with exceptions for certain statutorily authorized recipients (specifically, licensed resellers or government agents). *See* PHL § 1399-*ll*(1). The statute also makes it illegal for a common carrier "to knowingly transport cigarettes to any person" in New York who is not "reasonably believed by such carrier" to be a statutorily authorized recipient. *Id*. at § 1399-*ll*(2). "[I]f cigarettes are transported to a home or residence," the law "presume[s]" the carrier's knowledge that the delivery was unauthorized. *Id*. Violation of these provisions results in a civil penalty, imposed on the shipper or carrier, of $5,000 for each violation or $100 per pack of cigarettes shipped. *Id*. at § 1399-*ll*(5). Both the NYAG and corporation counsel for political subdivisions of the state are authorized to bring an action against a violator to recover civil penalties. *Id*. at § 1399-*ll*(6).

## C.     The NYAG's First Investigation of UPS

Faced with widespread resistance to the collection of cigarette taxes by reservation cigarette sellers, the State turned its attention to the common carriers who delivered cigarettes for those sellers. In 2004, the NYAG began investigating cigarette deliveries made by UPS to residential customers, in violation of PHL § 1399-*ll*. The investigation concluded that UPS regularly delivered unstamped cigarettes to residential customers in New York and that such deliveries originated principally from reservation sellers. Many of those sellers advertised their cigarettes as "tax-free" and accepted orders over the Internet or by telephone.

After some negotiation, the NYAG and UPS agreed that in exchange for the NYAG's refraining from bringing a civil suit against UPS for its alleged violations of PHL § 1399-*ll*, UPS would enter into a settlement agreement in the form of an Assurance of Discontinuance. The AOD was executed in October 2005 and became effective approximately one month later. In the AOD, UPS agreed, *inter alia*, to comply with PHL § 1399-*ll* and to adhere to its own internal "Cigarette Policy," which also prohibits the shipment of cigarettes to consumers. The AOD also required UPS to adhere to a detailed set of policies and procedures

in furtherance of its compliance with PHL § 1399-*ll*. UPS agreed to do, among other things, the following:

- Take measures to ensure that UPS's drivers, pre-loaders and other employees are "actively looking" for "indications" that a package might contain cigarettes and "alerting UPS management of such packages and attempting to intercept such packages," S. App'x at 506 ¶ 35;

- Develop and maintain a database of cigarette shippers, compiled from those sellers identified by the NYAG, UPS's own database (using such words as "cigarette," "smoke," and "tobacco"), UPS's knowledge of known cigarette retailers, and Internet searches of cigarette websites, S. App'x at 499–500 ¶¶ 21–22;

- Terminate relationships with shippers that unlawfully attempt to use UPS to ship cigarettes to unauthorized recipients and report those shippers to the NYAG, S. App'x at 502 ¶¶ 26–27;

- Instruct drivers not to deliver packages containing cigarettes to unauthorized recipients, S. App'x at 505–06 ¶¶ 34, 36;

- Promulgate and publicize to customers selling cigarettes a policy prohibiting cigarette shipments to unauthorized recipients, S. App'x at 500 ¶ 23; and

- "[A]udit shippers where there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the

14

shippers are in fact doing so," S. App'x at 501 ¶ 24.

The AOD also contains a penalty provision subjecting UPS to "a stipulated penalty of $1,000 for each and every violation of [the AOD] . . . provided, however, that no penalty shall be imposed if (a) the violation involves the shipment of Cigarettes to an Individual Consumer outside the State of New York, or (b) the violation involves the shipment of Cigarettes to an Individual Consumer within the State of New York, but UPS establishes to the reasonable satisfaction of the [NYAG] that UPS did not know and had no reason to know that the shipment was a Prohibited Shipment." S. App'x at 508 ¶ 42. The AOD also explicitly states that the "rights and remedies in [the AOD] are cumulative and in addition to any other statutory or other rights that the [NYAG] may have at law or equity, including but not limited to any rights and remedies under PHL § 1399-*ll*." S. App'x at 511 ¶ 51.

UPS also represented, through the AOD, that it had informed approximately 400 shippers that had accounts with UPS that it would no longer accept packages containing cigarettes for delivery to unauthorized recipients in New York, that it had conducted an unannounced audit of ten shippers, and that

15

it had begun providing formal training to its delivery drivers regarding PHL § 1399-*ll*. S. App'x at 496 ¶¶ 11–13.

## D.     The NYAG's Second Investigation of UPS

In 2011, after agents of the DTF seized packages containing cigarettes from a UPS facility near Potsdam, New York, the NYAG conducted a second investigation into UPS's shipment of unstamped cigarettes from Native American reservations to individual consumers. As a result of that investigation, the NYAG notified UPS that it had breached the AOD with respect to packages it had delivered for shippers located on reservations near Potsdam (the "Potsdam Shippers"). After a dialogue between the NYAG and UPS, the NYAG eventually demanded that UPS pay a penalty for its violations of the AOD. UPS refused the NYAG's demand for penalties, but it did provide the State with certain delivery information regarding the Potsdam Shippers.

Approximately two years later, the New York City Department of Finance ("City Finance") served a subpoena on UPS seeking delivery records for a number of other shippers located on reservations. City Finance also conducted a number of controlled buys of unstamped cigarettes after the First Deputy Sheriff of City Finance received an email from a store called "Seneca Cigars" advertising

16

untaxed cigarettes shipped via UPS. The controlled buys were successful: City

Finance received packages containing unstamped cigarettes which had been

shipped via UPS. Between the time UPS received the subpoena from City Finance

in July 2013 and February 2015 (when this lawsuit was commenced) the parties

engaged in a number of communications, during which time the plaintiffs

provided UPS with, *inter alia*, a draft complaint. After negotiation between the

parties broke down, the plaintiffs filed this lawsuit.

## II.     The Federal Regulatory Regime

Unlawful cigarette sales have also attracted the attention of the United

States Congress. Two federal laws, relevant here, regulate the sale and shipment

of cigarettes.

### A.     The Contraband Cigarette Trafficking Act

In 1978, Congress enacted the Contraband Cigarette Trafficking Act, which

established criminal and civil penalties for trafficking in untaxed cigarettes. *See* 18

U.S.C. § 2341 *et seq.* The CCTA makes it illegal "for any person knowingly to

ship, transport, receive, possess, sell, distribute, or purchase contraband

cigarettes." *Id*. at § 2342(a). The CCTA defines "contraband cigarettes" as "a

quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of

applicable State or local cigarette taxes in the State or locality where such cigarettes are found." *Id*. at § 2341(2).[5]

The CCTA is enforceable by states, through their attorneys general, as well as local governments, through their chief law enforcement officers. *See id*. at § 2346(b)(1). Such enforcers may seek "civil penalties, money damages, and injunctive or other equitable relief . . . in addition to any other remedies under Federal, State, local, or other law." *Id*. at § 2346(b)(2)–(3).

## B.     The Prevent All Cigarette Trafficking Act

In 2010, Congress enacted the Prevent All Cigarette Trafficking Act, 15 U.S.C. 375 *et seq.*, to: "require Internet and other remote sellers of cigarettes and smokeless tobacco to comply with the same laws that apply to law-abiding tobacco retailers; create strong disincentives to illegal smuggling of tobacco products; provide government enforcement officials with more effective enforcement tools to combat tobacco smuggling; make it more difficult for cigarette and smokeless tobacco traffickers to engage in and profit from their illegal activities; increase collections of Federal, State, and local excise taxes on

---

[5] There are exceptions to this definition of "contraband cigarettes" that are not relevant here. *See, e.g.,* 18 U.S.C. § 2341(2) (requiring "contraband cigarettes" to also be in the possession of non-exempt persons).

cigarettes and smokeless tobacco; and prevent and reduce youth access to inexpensive cigarettes and smokeless tobacco through illegal Internet or contraband sales." Pub. L. No. 111–154, §§ (1)(c)(1)–(6).

To achieve these ends, the PACT Act outright bans the mailing of cigarettes through the United States Postal Service ("USPS"). *See* 18 U.S.C. § 1716E(a)(1). The PACT Act also requires cigarette sellers who ship cigarettes to consumers to comply with all applicable state and local tax requirements, 15 U.S.C. § 376a(a)(3); comply with strict registration, reporting, and record-keeping duties, *id*. at §§ 376a(a)(1)–(2), (c); and mark the outside of any packages containing cigarettes with a conspicuous label indicating that the package contains cigarettes and that federal law requires the payment of all applicable excise taxes, *id*. at § 376a(b). The PACT Act also requires the U.S. Attorney General to create a "Non-Compliant List" ("NCL") of delivery sellers of cigarettes, and to update and distribute that list on a regular basis to USPS, state attorneys general, and others. *Id*. at § 376a(e)(1).

As particularly relevant in this case, the PACT Act also imposes restrictions on common carriers' rights to transport cigarettes. The Act prohibits a common carrier from delivering any package that does not contain the required tobacco-

19

disclosure label, if the carrier "knows or should know the package contains cigarettes." *Id*. at § 376a(b)(2). The PACT Act further prohibits common carriers from "knowingly complet[ing] . . . a delivery of any package for any person whose name and address are on the [NCLs]." *Id*. at § 376a(e)(2)(A).

Despite wide-sweeping regulations on the sale of cigarettes, the PACT Act exempts certain common carriers from its requirements. Pursuant to these exemptions, any requirements or restrictions placed directly on common carriers by the statute do not apply to a common carrier that has entered into a qualifying settlement agreement. UPS's AOD, which is explicitly named in the statute, qualifies "if [it] is honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers." *Id*. at § 376a(e)(3)(B)(ii)(I). The statute specifically enumerates two other qualifying settlement agreements with the NYAG, the Assurances of Discontinuance executed by DHL Holdings USA, Inc. ("DHL"), and Federal Express Corporation ("FedEx"). *See id.*

Congress similarly afforded common carriers the same exemption from enforcement of state statutory bans on cigarette shipments to consumers, such as PHL § 1399-*ll*, by providing that such state laws are preempted as applied to common carriers that qualify for PACT Act exemption. *See id.* at

20

§ 376a(e)(5)(C)(ii). The PACT Act bars a state from enforcing such a delivery ban against a common carrier "without proof that the common carrier is not exempt" from the PACT Act. *Id*.

The PACT Act empowers states, through their attorneys general, and local governments, through their chief law enforcement officers, to bring suits against violators. *Id*. at § 378(c)(1)(A). Common carriers who violate the PACT Act are subject to a civil penalty of "$2,500 in the case of a first violation, or $5,000 for any violation within 1 year of a prior violation" *id*. at § 377(b)(1)(B), in addition to any criminal penalty and "any other damages, equitable relief, or injunctive relief awarded by the court, including the payment of any unpaid taxes to the appropriate Federal, State, local, or tribal governments," *id*. at § 377(b)(2).

## III. Procedural History

### A. The Complaint Against UPS

The State and City filed their first complaint against UPS on February 18, 2015, and a first amended complaint ("FAC"), on May 1, 2015. The FAC alleged that despite entering the AOD, UPS continued to service numerous contraband cigarette enterprises operating out of smoke shops located on the following Native American reservations within the State: the Seneca Cattaraugus

Reservation, the Seneca Allegany Reservation, the Tonawanda Reservation, and the St. Regis Mohawk Reservation. The plaintiffs' claims were directed specifically at UPS's conduct with regard to twenty-two entities (the "Relevant Shippers"), grouped as follows:

- "Elliott Enterprise Group," consisting of Elliott Enterprise(s), Elliott Express (or "EExpress"), and Bearclaw Unlimited/AFIA;

- "Shipping Services Group," consisting of Seneca Ojibwas Trading Post, Shipping Services, and Morningstar Crafts & Gifts;

- Indian Smokes;

- "Smokes & Spirits Group," consisting of Smokes & Spirits, Native Outlet, A.J.'s Cigar, Sweet Seneca Smokes, and RJESS;

- "Native Wholesale Supply Group," consisting of Native Wholesale Supply and Seneca Promotions;

- "Arrowhawk Group," consisting of Seneca Cigarettes/Cigars, Hillview Cigars, Two Pine Enterprises, and Arrowhawk Smoke Shop;

- "Mohawk Spring Water Group" consisting of Mohawk Spring Water and Action Race Parts; and

- Jacobs Manufacturing/Tobacco.

The plaintiffs alleged that UPS serviced the Relevant Shippers by delivering unstamped cigarettes from their businesses to residences in the State and City. The plaintiffs claimed that the records they had obtained indicated that between January 2010 and November 2014, UPS made over 78,000 deliveries to

22

residents throughout the State and City on behalf of the Relevant Shippers. The complaint alleged that UPS knew that these shipments contained unstamped cigarettes based on, *inter alia*, UPS's prior experience in connection with the NYAG's investigation and the AOD; numerous court decisions regarding Native American reservation smoke shops' non-compliance with the State's cigarette tax regime; widespread media reporting; UPS's entering into tobacco delivery contracts with most or all of the reservation smoke shops for which UPS shipped and delivered cigarettes; UPS employees visiting, observing, and picking up packages for reservation smoke shops; and UPS's general practice of enmeshing itself deeply in its customers' businesses.

The FAC asserted fourteen causes of action seeking various forms of relief under the CCTA, the PACT Act, PHL § 1399-*ll*, the AOD, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68.[6]

### B.    Pre-Trial Motion Practice

On May 22, 2015, UPS filed a motion to dismiss the FAC pursuant to Rule 12(b)(6). UPS raised several arguments in its motion, including that (1) all claims

---

[6] The district court awarded summary judgment to UPS on the RICO claims. That ruling is not challenged on appeal.

must be dismissed for failure to plausibly allege that UPS delivered cigarettes or that UPS knew that those deliveries contained cigarettes, (2) the CCTA claims must be dismissed because the plaintiffs did not allege that UPS engaged in any single transaction involving the shipment of more than 10,000 unstamped cigarettes, (3) the PACT Act claims must be dismissed because UPS is exempt from suit based on its AOD, and (4) the PHL § 1399-*ll* claims must be dismissed because that statute is preempted by the PACT Act.

The district court rejected several of UPS's claims, including UPS's contention that the plaintiffs had not adequately pled that UPS knowingly delivered unstamped cigarettes, and UPS's argument that the plaintiffs' CCTA claims failed because the FAC did not allege that UPS participated in any transaction in which it shipped more than 10,000 unstamped cigarettes.

Lastly, the court addressed UPS's contention that the claims brought pursuant to the PACT Act and PHL § 1399-*ll* were subject to dismissal because the PACT Act exempts UPS from its requirements so long as the AOD "is honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers." 15 U.S.C. § 376a(e)(3)(B)(ii)(I). In addressing whether the PACT Act and PHL § 1399-*ll* claims against UPS should be

24

dismissed, both parties' briefing assumed that the "is honored" language in the exemption provision refers to whether UPS has *complied* with the terms of the AOD. UPS argued that the plaintiffs had failed to adequately allege that UPS was not entitled to the benefit of the exemption due to violations of the AOD. On the other hand, the plaintiffs argued that by alleging that UPS had breached the AOD by violating several of its provisions, they had adequately alleged that UPS had not "honored [the AOD] throughout the United States."

On July 30, 2015, the district court held oral argument on the motion to dismiss; during that argument, the parties maintained the positions they had taken in their briefs. Subsequently, on August 26, 2015, the court issued an order informing the parties that it was considering a reading of the PACT Act's exemption provision that had not previously been advanced by either party. The court explained that, under its proposed alternative reading, the exemption provision is a definitional provision that merely defines the types of settlement agreements that qualify for exemption and does not purport to reach questions of compliance or noncompliance with the obligations assumed under any particular agreement. *See New York v. United Parcel Service, Inc.*, 179 F. Supp. 3d 282, 291 (S.D.N.Y. 2016). Because the parties had not addressed that statutory reading in

25

their briefing or at oral argument, the court invited the parties to submit supplemental briefing that did so.

The parties each filed supplemental briefs on September 9, 2015. UPS argued that the text and structure of the PACT Act compelled the interpretation that the court was considering—that the exemption provision was merely definitional. The plaintiffs' supplemental brief continued to advocate for the reading they had previously advanced—that UPS was entitled to the exemption only if it had fully complied with the requirements imposed on it by the AOD—and that the allegations in their complaint were sufficient to vitiate the exemption.

On September 16, 2015, the district court issued a decision dismissing the claims brought pursuant to the PACT Act and PHL § 1399-*ll*, and denying UPS's motion as to the remaining claims. *See New York v. United Parcel Service, Inc.*, 131 F. Supp. 3d 132 (S.D.N.Y. 2015). The court's dismissal of the PACT Act and PHL § 1399-*ll* claims was premised on the interpretation of the exemption provision that the court had advanced in its earlier order. The court understood the term "honored" in the exemption provision to mean "recognized" and thus held that UPS would be exempt from the PACT Act if the AOD had appropriate breadth

such that all states in the country *recognized* the AOD. The court concluded that because the FAC failed to allege that the AOD had not been recognized by states nationwide, UPS's exemption from the PACT Act remained in place. Given that the plaintiffs had failed to even allege that the AOD had not been recognized nationwide, the court concluded that it "need not determine the precise procedure by which a state must honor an agreement." *Id.* at 142.

On October 21, 2015, the plaintiffs moved for leave to file a second amended complaint ("SAC"), seeking to add back the previously dismissed claims brought under the PACT Act and PHL § 1399-*ll*. The basis for the motion was that the plaintiffs had not anticipated the court's interpretation of the PACT Act, and as a result had not previously had an opportunity to plead such claims in light of that interpretation. On November 23, 2015, the court granted the plaintiffs' motion and the plaintiffs filed the SAC on November 30, 2015.

The SAC alleged that the AOD is *not* recognized by all states in the nation. It noted several states that have their own cigarette delivery ban statutes and do not recognize the AOD. It also explained that under the AOD, no state other than New York has any right to enforce the AOD, nor any right to obtain a penalty for an illegal cigarette delivery into that state. Further, the plaintiffs revived their

27

compliance interpretation of the exemption provision, alleging that because UPS had not complied with the terms of the AOD, the PACT Act's exemption provision was inapplicable to the claims it had brought under the PACT Act and PHL § 1399-*ll*.[7]

On February 2, 2016, UPS moved for partial summary judgment on the PACT Act and PHL § 1399-*ll* claims seeking to have them dismissed once again on the ground that UPS is exempt from both statutes since the AOD is recognized nationwide. UPS acknowledged that the plaintiffs had submitted declarations from assistant attorneys general in six states who had asserted that they do not have the right to enforce the AOD, and therefore would not utilize the AOD to block deliveries of cigarettes to consumers. However, UPS argued that the "states should be deemed to 'honor' an agreement enumerated in the Exemption

---

[7] The plaintiffs later moved for leave to file a third amended complaint ("TAC"), for the purpose of broadening their allegations of UPS's misconduct. The plaintiffs claimed that discovery had revealed that UPS had failed to conduct audits of customers it had reason to believe were shipping cigarettes, failed to train its workers to prevent cigarette trafficking, and failed to maintain internal databases of tobacco shippers, all of which violated specific provisions of the AOD. The plaintiffs also claimed that discovery had revealed that in addition to serving brick-and-mortar smoke shops on Indian reservations, UPS also handled accounts that had no physical retail location, but which UPS must nevertheless have known were cigarette dealers. UPS consented to the plaintiffs' motion. The court granted leave and the plaintiffs filed the TAC on February 24, 2016.

Provision as long as the agreement is still active nationwide." UPS Memo of Law in Support of its Motion for Partial Summary Judgment at 10, *New York v. UPS*, 179 F. Supp. 3d 282 (S.D.N.Y. 2016) (No. 15 Civ. 1136 (KBF)), ECF No. 173. Put another way, UPS explained, a state must honor an agreement if "the parties to the agreement have not terminated the agreement or otherwise rendered it inactive, and the policies and practices memorialized in the agreement are still maintained nationwide." *Id*.

On the other hand, the plaintiffs contended that the exemption provision did not exempt UPS when it was enacted, but, instead, provided only for the possibility of future exemption upon all fifty states affirmatively assenting to the AOD, a condition that UPS had never fulfilled. The plaintiffs argued that by providing declarations of several state attorneys general and a representative of the National Association of Attorneys General stating that they do not "formally acknowledge" or "accept" the AOD, they had established that the AOD is not honored nationwide, and therefore UPS had lost its exemption from the PACT Act.

The court issued its summary judgment decision on April 19, 2016, at which time it took another look at the exemption provision. *United Parcel Service,*

29

*Inc.*, 179 F. Supp. 3d at 282. It explained that while the phrase "'is honored' most plausibly means 'is recognized,'" the passive language of the exemption provision is ambiguous as to whether it means "'is honored [by states nationwide],' or 'is honored [by UPS nationwide],' or both." *Id*. at 293 (alterations in original). Therefore, while the court had previously granted in part UPS's motion to dismiss concluding that UPS is entitled to the exemption if the AOD was "recognized" by all states in the nation, based on the parties' fuller arguments and the evidence that had been developed, the court came to the conclusion that "is honored" also requires that UPS *itself* give the AOD nationwide breadth.

The court's updated understanding was that the exemption provision "does not require that a carrier's policies be 100% effective at preventing the shipment of cigarettes to consumers," but that "UPS may not retain the exemption simply by maintaining the requisite policies nationwide *in name only*." *Id*. at 306 (emphasis in original). Thus, it concluded that "if [the] plaintiffs could present evidence creating an inference that the effectiveness of UPS's policies is so compromised that these policies are not in fact in place, that would be sufficient to raise a genuine issue of fact for trial." *Id*.

After reviewing the factual materials submitted by the parties, the court concluded that the plaintiffs' evidence did "not support the inference that UPS's purported non-compliance [was] so severe that UPS no longer 'honor[ed]' the AOD throughout the United States as that term is used in [the exemption provision]." *Id.* But, since the court had changed its interpretation of the exemption provision, it allowed the plaintiffs an opportunity to make an additional factual showing in an attempt to raise a genuine issue of material fact. It explained that two types of evidence would be relevant to a determination that UPS had not honored the AOD: *first*, the plaintiffs could present evidence of a sufficiently large number of instances of shipments of contraband cigarettes to suggest that UPS had turned a blind eye toward such unlawful shipments; and *second*, the plaintiffs could present evidence showing that UPS policymakers had in fact turned a blind eye to shipments of contraband cigarettes.

At a hearing held on June 7, 2016, the plaintiffs made an oral presentation to the court that included both types of relevant evidence. UPS responded with its own presentation. By the end of the hearing the court was convinced that there was a triable issue of fact as to whether UPS had given nationwide effect to

the AOD. It noted that the plaintiffs had made a sufficient showing that UPS had, in large part, abandoned the AOD at least in New York.

### C.   UPS's Rule 26 Motion

While the parties were engaged in motion practice over the PACT Act and PHL § 1399-*ll* claims, they continued to have discovery disputes. On January 20, 2016, UPS submitted a letter motion to the court seeking to compel the plaintiffs to provide more complete responses to certain interrogatories issued during discovery. On February 1, 2016, the court denied the motion as untimely, reasoning that UPS had failed to raise any issue regarding plaintiffs' interrogatory responses in either of the two discovery conferences held by the court, nor had it spoken up in response to the court's April 3, 2015, scheduling order. At the second conference, which took place on November 18, 2015, the court expressly enumerated the outstanding discovery and other issues that remained to get the matter ready for trial, which did not include the issue UPS raised in its letter motion. In denying the motion, the court explained that "it was incumbent upon UPS to raise any additional discovery issues that it had and whether it sought to obtain further responses from plaintiffs with respect to their interrogatory responses" at the second discovery conference, but that instead,

32

"UPS affirmatively stated that it was seeking to move the case forward and noted that fact discovery as to plaintiffs had expired on November 17, 2015." S. App'x at 30.

Nevertheless, the court recognized that UPS's concern about lacking information to prepare for trial was important. It noted that given the particular parties in the case and the nature of the claims, UPS had not had the opportunity to depose representatives of the plaintiffs and ask about the factual bases for their claims. The court therefore ordered the plaintiffs to provide UPS with information regarding the nature of the plaintiffs' expected proof for an exemplar shipper group for which it expected to establish UPS's liability. Specifically, the district court required the plaintiffs to provide UPS with the following information for an exemplar shipper: exemplars of shipments alleged to have contained cigarettes or the plaintiffs' basis (if circumstantial) as to what proof would be offered as to this element, the facts and circumstances showing UPS's knowledge of the contents of shipments (or, if circumstantial, a clear statement of circumstantial facts), and a calculation of each plaintiff's damages as to the specific shipper.

The plaintiffs complied with that order in a disclosure dated March 3, 2016. This disclosure (the "Arrowhawk Letter") provided detailed information for the "Arrowhawk Group" of shippers. The Arrowhawk Letter disclosed that the plaintiffs would use UPS's billing and delivery spreadsheets, produced by UPS and identified by Bates number, to calculate how many packages UPS shipped for the Arrowhawk Group. Specifically, it listed six UPS account numbers associated with the Arrowhawk Group, and identified the specific UPS spreadsheets containing packages for those account numbers. It also explained that it would prove that the shipments identified contained cigarettes with, *inter alia*, testimony regarding the nature of the Arrowhawk Enterprise as a cigarette dealer and shipping invoices listing the contents of packages shipped by UPS.

The Arrowhawk Letter also explained that the plaintiffs would attempt to prove UPS's knowledge of the contents of packages shipped by the Arrowhawk Group by presenting evidence of the following:

- "Pickup location was a warehouse next to a retail business named 'Arrowhawk Smoke Shop' that prominently displayed outdoor advertisements for cigarettes, and which had a visible inventory that consisted almost exclusively of large stacks of cigarette cartons;

34

- UPS drivers purchased cigarettes and/or received cigarettes for free from employees of the Arrowhawk Enterprise at both the smokeshop and the warehouse;

- UPS drivers routinely observed the following inside the warehouse:

  - Cases of cigarettes with visible printed markings indicating their contents;

  - Cases of cigarettes cut in half and left open, revealing clearly-marked cartons of cigarettes inside;

  - No inventory items other than these cases and cartons of cigarettes;

  - Arrowhawk Enterprise employees visibly opening cases and repackaging cigarette cartons into other boxes for shipment by UPS;

  - Custom-made boxes used for the UPS shipments, which were marked with '[x-y] carton' indicating how many cigarette cartons that size of box could hold;

- UPS drivers returned packages to the warehouse that had been rejected by customers. These packages contained cigarettes, and at least some were partially open when returned;

- The totality of the circumstances, including the volume of shipments, the location of the pickups on an Indian reservation, and the other shipping location descriptors, indicated that the Arrowhawk Enterprise was a cigarette dealer,

35

especially given the residential addresses of the consignees and the pattern of repeat shipments;

- UPS has admitted that it knew that any cigarettes being shipped from Indian reservations in New York would be untaxed contraband."

J. App'x at 424.

Lastly, the Arrowhawk Letter set forth a chart indicating that the State and City would each seek damages and penalties for violations of the CCTA, RICO, PACT Act, PHL § 1399-*ll*, and the AOD.[8] The chart indicated that the plaintiffs would seek to recover the unpaid taxes on each carton of cigarettes UPS shipped for the Arrowhawk Group under the CCTA and PACT Act,[9] per-violation penalties for each package and carton of cigarettes shipped under the PACT Act and PHL § 1399-*ll*, respectively, and a $1,000 stipulated penalty for each package that UPS had failed to audit in accordance with the audit provision of the AOD. It revealed that the plaintiffs sought more than $83 million in damages and

---

[8] The one exception was that the City was not seeking penalties under the AOD given that it was not a party to that agreement.

[9] The Arrowhawk Letter explained that certain calculations were contingent on issues that would be resolved later, such as the weight of each package and the number of cigarette cartons per package.

penalties under the CCTA, PACT Act, and PHL § 1399-*ll*, plus $8 million more under the AOD, with respect to the Arrowhawk Group alone.

### D.    The District Court's Liability Opinion

The case was tried to the bench on September 19–29, 2016. The parties called thirty-eight witnesses and submitted more than 1,000 documents into evidence. After receiving post-trial submissions and hearing closing arguments, the district court issued a 219-page opinion constituting its findings of fact and conclusions of law. *See New York v. United Parcel Service, Inc.*, 253 F. Supp. 3d 583 (S.D.N.Y. 2017).

The trial evidence focused on twenty-two shippers located on four Native American reservations in upstate New York. The court found that UPS knowingly transported unstamped cigarettes for seventeen of the shippers between 2010 and the date this lawsuit was filed. The court also found that UPS failed to audit those seventeen shippers plus three additional ones (collectively the "Liability Shippers"), despite having reasonable grounds to believe that each of them was delivering cigarettes to unauthorized recipients, in violation of the AOD. In support of its findings, the court recited "exemplar" facts in its decision that were representative of the evidence introduced at trial.

The district court found UPS's efforts to comply with the AOD were "inadequate" and "fell woefully short" between 2010, when the suit was filed, and 2013. *Id*. at 603.[10] Despite UPS's having had a "clear awareness" when it signed the AOD that it had assumed a number of explicit obligations which required affirmative efforts and vigilance to ensure compliance with its terms, *id*., "UPS's lack of commitment to true, active AOD compliance pervaded its corporate culture," *id*. at 604. Those in positions of responsibility at UPS knew that, in many respects, "UPS was 'flying blind' regarding whether Indian-reservation-based customers were shipping cigarettes." *Id*. The evidence showed UPS's wholesale disregard of the AOD's terms and its brazen disregard for the spirit of the agreement.

*First*, despite the AOD's express mandate that UPS train relevant personnel about its "Cigarette Policy" and various compliance measures, UPS delivered "little actual training." *Id*. at 607. The only training that UPS provided to its

---

[10] The court found that in 2013, faced with the prospect of a lawsuit, UPS increased its efforts to comply with the AOD. UPS's efforts in 2013 and 2014 were part of its "ramping up" process to get into compliance with the AOD, which was not achieved until the filing of the lawsuit on February 18, 2015. Thus, while UPS had transformed itself in time to avoid the imposition of an injunction or independent monitor, it was too late to avoid liability for its past conduct.

personnel was a three-minute annual pre-work message on tobacco compliance. Several employees did not recall the existence of the training and others recalled its existence but not its content. The court thus concluded that the little training UPS did conduct was "inadequate to properly train employees on UPS's Tobacco Policy and was inadequate to train employees on AOD compliance measures or on how to recognize signs that shippers may have been tendering packages with cigarettes." *Id*. The testimony and evidence revealed to the court that UPS's training on tobacco issues was designed merely to check the box, rather than to ensure that employees would observe and report signs of cigarette shipments.

*Second*, despite the AOD's requirement that UPS audit shippers whenever "there is a reasonable basis to believe that such shipper may be tendering Cigarettes for delivery to Individual Consumers," UPS implemented no formal audit policies for cigarette shippers and provided no audit training to its employees. The court found that UPS's audits were conducted far too infrequently to comply with the AOD. The district court reasoned that UPS knew that certain shippers had names that included the word "tobacco," "cigar," or "smokes," indicating a certainty of tobacco shipments and a reasonable possibility of cigarette shipments; it knew that a number of others (without

39

eponymous names) sold cigarettes, making shipments all the more likely; it knew that certain reservation shippers refused to disclose what they were shipping; it knew that others had opened multiple accounts or that new accounts were opened at the same addresses as ones recently terminated for cigarette shipments; and, of course, all of this was against the backdrop that those shippers were located on reservations that had been associated with sales and shipments of unstamped cigarettes for years. Despite this knowledge, the district court noted that UPS often failed to conduct audits until it was actually confronted with impermissible cigarette shipments in fortuitous ways, such as when cigarettes fell "out of a broken box." *See id*. at 615.[11]

*Third*, UPS failed to utilize information available to it in various places that provided employees, at all levels of its corporate structure, insight into the fact that it was regularly shipping unstamped cigarettes. For example, UPS received the NCLs created by the United States Department of Justice pursuant to the PACT Act, but inexplicably failed to use them to identify at-risk shippers; UPS

_____

[11] UPS pointed to 28 audits it conducted between 2011 and 2016, several of which were of the Relevant Shippers. But the court noted that 26 of those audits were conducted between 2013 and 2016, at a time when UPS had already received a subpoena and was aware of a likely impending lawsuit or had already been sued.

ignored inquiries it received from customers regarding lost or damaged packages (so called "tracers") which indicated that the customers were purchasing cigarettes from reservation sellers; and UPS drivers and sales account personnel who met with UPS's customers saw signage on or near the Liability Shippers' storefronts advertising cigarette sales and indeed saw cigarettes on display racks at the locations of the Liability Shippers.

*Fourth*, UPS took no action despite knowing that certain of its customers were routinely shipping unstamped cigarettes. UPS account executives entered details of meetings and communications with some of the Liability Shippers into a UPS database, evidencing their knowledge that their customers were shipping cigarettes. Those same account executives were responsible for obtaining a tobacco agreement (memorializing the seller's notification of the prohibition against cigarette deliveries to consumers) from each of their customers who would be shipping tobacco but frequently failed to do so in violation of the AOD's express terms. UPS allowed its personnel to rely heavily (and often exclusively) on what their shippers claimed to be shipping even in the face of contrary evidence.

*Fifth*, the district court found that UPS viewed the passage and

41

implementation of the PACT Act as a business opportunity. The court explained

that "as other couriers were required to terminate cigarette shippers as a result of

the PACT Act, UPS picked up the business." *Id*. at 618. It noted that the "evidence

supports an increase in shipments via UPS by the Relevant Shippers in the

months immediately following the effective date of the PACT Act." *Id*. Account

personnel and others at UPS knew that this surge was due, at least in part, to

capturing the business lost by USPS. The court did "not buy" UPS's contention

that it did not "put two and two together" to figure out that the passage of the

PACT Act is what led it to newfound business for customers located on Native

American reservations. *Id*. at 605.

Given that UPS had violated "so many different AOD obligations as to so

many shippers," the court "easily" found, *id*. at 664, that UPS "persistent[ly]

fail[ed] to honor the AOD," vitiating its PACT Act exemption, *id*. at 665.[12] The

court thus found UPS liable for violations of the AOD, PACT Act, PHL, and the

---

[12] The court rejected UPS's argument that because the plaintiffs had proven only violations of the AOD in New York, that it could not be shown that the AOD was not honored "nationwide." The court held "it would be odd to find that an AOD was not honored in its home state (here, New York) due to flagrant and repeated violations, but that because the home-state Attorney General did not prove violations in other states, the AOD was nonetheless 'honored' nationally." *Id*. at 664.

CCTA. Specifically, the court found UPS liable for violating the audit provision of the AOD, and it interpreted the audit provision to mean that UPS committed a new violation every time UPS shipped a package on behalf of a Liability Shipper once it had a reasonable basis to believe such shipper was shipping cigarettes. It held UPS liable for violating the PACT Act by knowingly delivering packages for five of the Liability Shippers that appeared on the NCLs. The court also found that UPS was liable under PHL § 1399-*ll* for knowingly delivering cigarettes, on behalf of seventeen of the Liability Shippers, to statutorily unauthorized recipients.

Lastly, the court found that UPS violated the CCTA and explained that it would award the plaintiffs compensatory damages for lost tax revenues equivalent to half of the amount of unpaid taxes on the cigarettes that UPS shipped for the Liability Shippers. The court limited the compensatory damage award to half of the state and local excise taxes that went unpaid on UPS's cigarette shipments on the reasoning that half of the purchasers would have managed to buy untaxed or lower-taxed cigarettes by some other means, that is, that they would have been "diverted" away from reservation sellers and found other ways to obtain untaxed cigarettes if UPS had complied with the law by

43

declining those shipments.

The court then turned to "the complicated question of determining the appropriate penalties to be imposed for the violations of the AOD and the various statutory schemes." *Id*. at 695. Since the plaintiffs sought per-violation penalties under the AOD, PACT Act and PHL § 1399-*ll*, the court was required to make determinations about how many packages and cartons of cigarettes UPS actually shipped for each of the Liability Shippers.

At trial, the plaintiffs had contended that the number of *packages* UPS shipped for each of the Liability Shippers, which was necessary to calculate both the AOD and PACT Act penalties, could be easily determined from UPS's delivery spreadsheets: they sorted the spreadsheets by the account numbers for the Liability Shippers, removed duplications, and added up the number of packages shipped.

UPS, for its part, argued that simply tallying the packages for each Liability Shipper would capture certain categories of packages that should be excluded, such as letter size envelopes, packages weighing less than one pound (since a carton of cigarettes weighs approximately one pound), and packages that UPS shipped *to* the Liability Shipper rather than just ones *from* the Liability Shippers.

The court noted that because the spreadsheets are in Excel format and are searchable, it would be straightforward to exclude such categories from the package count.

The method by which the court calculated the number of cigarette *cartons* UPS shipped for each Liability Shipper was slightly more complicated. At trial, the plaintiffs understandably did not present direct evidence showing the exact number of cartons of cigarettes contained in each of the packages that UPS shipped for the Liability Shippers. That would have been an impossible task. Rather, the plaintiffs presented sample evidence for each of the Liability Shippers, showing that the packages UPS shipped for such shippers contained cigarettes. Using such evidence, the court itself calculated a reasonable approximation as to the particular percentage of each Liability Shipper's packages that contained cigarettes. For some of the Liability Shippers that percentage was 100% and for others it was as low as 27%. The court explained that it would calculate the number of cartons of cigarettes that UPS shipped for each of the Liability Shippers by: taking the number of packages that UPS shipped for each Liability Shipper, multiplying it by the approximation of the percentage of packages for each Liability Shipper that contained cigarettes,

45

summing the weights of all such packages, and then dividing by one pound per carton of cigarettes.

Given the complexities in the per-violation penalty calculations, the court engaged the assistance of the parties in actually completing the calculations, applying the relevant dates, definitions, and findings it had provided. It ordered the parties to provide it with certain information to help it assess the appropriate quantum of penalties.[13]

---

[13] UPS moved to strike the plaintiffs' damages case because the plaintiffs failed to provide it with a robust pretrial damage computation pursuant to Fed. R. Civ. P. 26 and failed to anticipate evidentiary issues with the trial presentation of their damages claim. The court found preclusion of the plaintiffs' damages case unwarranted for several reasons: (1) the Arrowhawk Letter complied with the court's order and provided UPS with enough information regarding the nature of the plaintiffs' proof, (2) the plaintiffs in fact used the type of evidence and testimony that they had identified in the Arrowhawk Letter, (3) UPS had declined the plaintiffs' offer to provide it with a full damages and penalties calculation for each shipper several weeks before trial, and (4) UPS undoubtedly possessed the information to replicate the same calculation in the Arrowhawk Letter for each shipper.

Importantly, the court noted that the damages and penalty calculations were ultimately based on known data points: penalty ranges set forth in the AOD and statutory schemes at issue, and compensatory damages based on the statutory tax rate imposed on a carton of cigarettes. The court rejected UPS's argument that it was somehow prejudiced by the plaintiffs' inadequate pre-trial disclosure, concluding that UPS's complaints "[rang] hollow" given that it had a detailed disclosure regarding the Arrowhawk Group yet did not identify any rebuttal witnesses or testimony. 253 F. Supp. 3d at 686. It viewed UPS as having made deliberate tactical choices to position its preclusion argument.

### E. The District Court's Damages and Penalties Opinion

After the district court received the parties' submissions, it issued an opinion and order on damages and penalties. *See New York v. United Parcel Service, Inc.*, 15–cv–1136 (KBF), 2017 WL 2303525 (S.D.N.Y. May 25, 2017). The court explained that the plaintiffs had appropriately complied with the court's order, but that UPS had "refused to include a majority of the information requested by the Court," providing package counts with respect to only three of the Liability Shippers.[14] *Id*. at *2. The court thus deemed UPS to have waived arguments relating to the calculations submitted by the plaintiffs and the court calculated its determination of damages and penalties using the uncontested numbers of packages and cartons supplied by the plaintiffs.

The court believed that significant penalties were appropriate and it explained the factors that it considered in assessing appropriate penalties. *First*, it cited UPS's level of culpability, including "[n]umerous separate acts by numerous UPS employees [that] allowed vast quantities of unstamped cigarette shipments to be delivered to unauthorized recipients in New York." *Id*. at *3.

---

[14] The court explained that UPS's submission "demonstrate[d] a lack of cooperation and, frankly, odd abrasiveness" which was "consistent with UPS's lack of acceptance of responsibility for their actions at issue in this case." *Id*. at *2.

*Second*, it cited the harm to public health caused by UPS's conduct, noting, however, that it was also the case that UPS, as the transporter rather than manufacturer or seller of cigarettes, bears a lower level of culpability for the impact on public health than other entities. *Third*, the court explained that UPS's limited profits from the violations would suggest a relatively low penalty. *Lastly*, the court noted that UPS could bear a hefty fine which would "capture the attention of the highest executives in the company." *Id*. at *4.

Finally, the court set out its damages and penalty determination with respect to each statutory regime and the AOD. With respect to the AOD, the court awarded the State the $1,000 stipulated penalty for every package that UPS shipped on behalf of a Liability Shipper, once it had a reasonable basis to believe that such shipper was tendering cigarettes. The court used the plaintiffs' tally of the packages for each Liability Shipper (having applied the appropriate dates from the liability opinion), to calculate penalties of $80,468,000 due to the State under the AOD.

With respect to the PACT Act, the court calculated the maximum per-violation penalties authorized by the statute: $2,500 for the first violation and $5,000 per subsequent violation for every package UPS shipped for the five

Liability Shippers who were on the NCLs. Using the package counts provided by the plaintiffs, the court concluded that imposing the maximum per-violation penalties would entitle the State to $70,517,500 and the City to $86,182,500. Given the "totality of the facts and circumstances" of the case, however, the court awarded the plaintiffs only 50% of the maximum available PACT Act penalties: $35,258,750 to the State and $43,091,250 to the City. *Id.* at *7.

With respect to PHL § 1399-*ll*, the court applied the $5,000 per-violation penalty permitted by the statute to the number of cartons UPS had shipped for each of the Liability Shippers. It calculated that the maximum penalty award under the statute was $82,820,000 to the State and $74,690,000 to the City. Again, however, considering the "totality of the facts and circumstances" of the case, the court awarded the plaintiffs 50% of the maximum available PHL § 1399-*ll* penalties: $41,410,000 to the State and $37,345,000 to the City. *Id.* at *8.

Lastly, the district court awarded the plaintiffs compensatory damages under the CCTA. The court measured the compensatory damages "by plaintiffs' lost tax revenue attributable to the number of packs/cartons of cigarettes UPS knowingly shipped to the Liability Shippers, using a 50% diversion rate." *Id.* at *9. Given the court's findings on the number of cartons of cigarettes UPS shipped

49

for which no tax was paid, it awarded compensatory damages for unpaid taxes

of $8,679,729 to the State and $720,885 to the City under the CCTA.[15]

The total award against UPS summed to $246,975,614.

**DISCUSSION**

Both UPS and the plaintiffs appeal from the district court's post-trial

rulings. UPS urges us to overturn both the district court's liability and damages

rulings. With respect to liability, UPS argues that the district court erred in: (1)

finding it non-exempt from the PACT Act; (2) awarding the State penalties under

the AOD for violations of the audit obligation; and (3) finding it liable for

violations of the CCTA. With respect to damages, UPS argues that the district

court erred in: (1) awarding the plaintiffs damages and penalties based on the

evidence presented, which it claims should have been precluded; (2) awarding

the plaintiffs 50% rather than only 5.4% of the amount of unpaid taxes on the

cigarette cartons UPS transported in violation of the CCTA; and (3) imposing a

"gargantuan" penalty award upon it, Appellant's Br. at 41 & 77. The plaintiffs

cross-appeal on the ground that the district court erred in not awarding them the

---

[15] The court also awarded the plaintiffs $1,000 each in nominal penalties under
the CCTA.

50

full amount of unpaid taxes.

## I.     Standard of Review

"In evaluating a challenge to a judgment entered after a bench trial, we review the district court's findings of fact for clear error and its legal conclusions *de novo.*" *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013). Among the conclusions of law that we review de novo are the court's interpretations of the statutes at issue and the AOD. *See Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 320 (2d Cir. 2000).

We review the district court's decision on whether to preclude a party's damages case and rulings on discovery sanctions for abuse of discretion. *See Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006); *Funk v. Belneftekhim*, 861 F.3d 354, 365 (2d Cir. 2017). We also review the district court's assessment of damages and penalties for abuse of discretion. *See Advance Pharmaceutical, Inc. v. United States*, 391 F.3d 377, 398 (2d Cir. 2004).

## II.    The Liability Theories

We start with UPS's several attacks on the district court's liability rulings: *first*, that it is exempt from the PACT Act and PHL § 1399-*ll* because it "honored [the AOD] throughout the United States;" *second*, that the AOD's penalty

provision does not authorize penalties for violations of the audit obligation; and

*third*, that the plaintiffs failed to establish the threshold quantity and scienter

elements of the CCTA.

## A. UPS Did Not Honor the AOD and is Therefore Subject to Liability Under the PACT Act and PHL § 1399-*ll*.

UPS contends that the district court erred by holding it liable for violations

of the PACT Act and PHL § 1399-*ll*.[16] It does not dispute that its conduct would

violate those statutes if they apply here—because UPS knowingly made

deliveries for NCL shippers, in violation of the PACT Act, and because UPS

knowingly shipped cigarettes to recipients not authorized to receive them, in

violation of PHL § 1399-*ll*(2). Rather, UPS asserts that it was error for the district

court to find it liable under those statutes because it is exempt from the PACT

Act, and PHL § 1399-*ll* is therefore preempted.

The exemption provision of the PACT Act states that UPS, FedEx, and

DHL are exempt from the PACT Act if their AODs are "honored throughout the

---

[16] For the most part, in the interest of simplicity, we discuss the question in terms of whether UPS is exempt from the provisions of the PACT Act. Because the PACT Act preempts state laws such as PHL § 1399-*ll*(2) only when the PACT Act exemption applies, UPS's liability under both the PACT Act and PHL § 1399-*ll*(2) turns on the applicability of the PACT Act exemption.

United States to block illegal deliveries of cigarettes." 15 U.S.C.

§ 376a(e)(3)(B)(ii)(I). The district court interpreted that provision to mean that in order to avail itself of the exemption, UPS was itself required to honor the AOD throughout the United States. It concluded that UPS had not so honored the AOD, because UPS had violated so many different AOD obligations as to so many shippers, from the time the AOD became effective until the date the lawsuit was filed, and because the widespread violations documented at trial resulted from a general corporate culture of disregard for the AOD and from the absence of UPS officials at every level to take reasonable steps to ensure compliance. UPS argues that it was error for the district court to take a compliance-based approach to determining whether the AOD was honored within the meaning of the exemption provision.

In interpreting the exemption provision, we look first to its plain language. *See Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013). The PACT Act provides that the Act's compliance obligations, as well as state delivery bans such as PHL § 1399-*ll*, "shall not apply to a common carrier that is subject to" one of various agreements, including UPS's AOD with the State. 15 U.S.C. § 376a(e)(3)(A). However, that exemption applies only "if [the carrier's agreement] is honored

53

throughout the United States to block illegal deliveries of cigarettes." *Id*. at

§ 376a(e)(3)(B)(ii)(I). Thus, as we have previously stated, UPS is exempt from the

PACT Act, and PHL § 1399-*ll* is preempted, to the extent that the AOD is

"honored throughout the United States to block illegal deliveries of cigarettes."

The most natural reading of the plain language of the exemption

provision—and indeed, the reading initially adopted by *both* sides in litigating

UPS's original motion to dismiss the complaint—is that a party "honors" an

agreement by complying with it. The relevant dictionary definitions (that is,

those that define "honor" as it relates to contracts), expressly advise that to

"honor" a contract means to live up to its terms. *See* MERRIAM WEBSTER'S

COLLEGIATE DICTIONARY (11th ed. 2008) (defining "honor" as "to live up to or

fulfill the terms of"); NEW OXFORD AMERICAN DICTIONARY (3d ed. 2015) (defining

"honor" as "[f]ulfill (an obligation) or keep (an agreement)").

That definition fully comports with ordinary usage. One does not "honor"

a contract merely by agreeing to it in the first instance, or by acknowledging the

existence of a contractual duty. When one asks her contractual counterparty

whether, in light of some recent event, he still intends to "honor" their contract,

she is asking whether he intends to comply with his obligations. When a

customer asks a store clerk whether she will "honor" the store's return policy, he

is asking whether the store will comply with the terms of its policy and process a

refund for the returned item. Similarly, contrary to the dissent's suggestion,

Dissenting Op. at 6-7, a bank does not "honor" a check simply by verbally

acknowledging the validity of the obligation; a bank "honors" a check by actually

*paying* on it. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining the verb

"honor": "[t]o accept or pay (a negotiable instrument) when presented."). These

definitions support the district court's ultimate conclusion that UPS could

"honor" the AOD only insofar as it "live[d] up to" or "fulfill[ed]" its obligations

under the agreement.

The context makes clear, moreover, that it is UPS itself that must "honor"

the AOD to obtain its exemption. Although the use of the passive voice does not

represent exemplary drafting, no other meaning makes sense. The meaning

suggested early in the litigation by the district court, that it is the 49 states other

than New York that must "honor" the AOD by somehow "recognizing" the

agreement is particularly far-fetched, and indeed UPS conspicuously fails to

advance that interpretation on appeal. That omission is unsurprising. The district

court itself abandoned this proposed meaning, and both the evidentiary

submission by the plaintiffs below and the amicus submission on behalf of 18 states, the District of Columbia, and Puerto Rico in this Court make clear that the AOD was not adopted nationwide by state attorneys general or other law enforcement officials. Nor is there any evidence in the record that *any* State ever announced its intention to accept UPS's promises to New York in the AOD as a substitute for any obligation UPS would otherwise have under the PACT Act or state law.

UPS and New York, as the only parties to the AOD, are the only parties capable of "honoring" it. Reading the exemption provision as a whole makes clear that, as between those parties, it is UPS that must do the "honoring." The party who must "honor" the AOD must do so "throughout the United States to block illegal deliveries of cigarettes." That could be a directive only to UPS. It would make no sense to require New York to "honor [the AOD] throughout the United States to block illegal deliveries of cigarettes." The PACT Act was not a demand that New York become the cigarette-tax enforcer for the entire United States. And indeed, the AOD itself makes clear that New York could not fulfill such a role, since the AOD does not permit the NYAG to seek penalties for acts occurring outside of New York. *See* S. App'x at 508 ¶ 42. Finally, since it is UPS

56

that will benefit from the exemption, it is logical to look to its actions to determine whether the exemption will apply, and conversely would be unfair to deprive UPS of the exemption because New York had somehow failed to "honor" the agreement.

Thus, the most reasonable interpretation of the exemption provision is that UPS's exemption remained in place to the extent that UPS itself "lived up to" or "fulfilled" its obligations under the AOD. We agree with the district court that UPS's wholesale noncompliance with the AOD means that it did not "honor" the AOD and therefore forfeited its exemption.

UPS makes no effort to argue that the district court's extensive factual findings on how little it did to fulfill its obligations under the AOD, which are set forth above in great detail, are clearly erroneous. Rather it attempts to deflect those findings by proposing alternative explanations of the exemption provision. First, it tells us that "honored throughout the United States" means that the agreement must have nationwide operation, and "[b]ecause it is undisputed that UPS's AOD has applied nationwide since its inception, the PACT Act exempts UPS from its reach and preempts the PHL." Appellant's Br. at 28–29 (internal citations omitted). Then it says it "is exempt from the PACT Act if [its]

57

obligations under the AOD are accepted as valid throughout the United States, even though UPS contracted only with New York." Appellant's Br. at 31 (emphasis omitted).

Mimicking the exemption provision itself, UPS avoids using active verbs and proper nouns in explaining the exemption provision. It says that it is exempt because the AOD has "nationwide operation," Appellant's Br. at 37, but fails to acknowledge that for the AOD to have actually "operat[ed]" nationwide *UPS* would have needed to take measures to implement the policies laid out in the AOD. Given the court's extensive factual findings, we know that UPS did not in fact do so.

UPS's alternative formulation is equally vague. It says that it is exempt if its obligations under the AOD are "accepted as valid," Appellant's Br. at 31, but it does not specify *who*—UPS or the 50 States and the District of Columbia—must do the "accept[ing]." In any event, UPS never clarifies what it would mean for UPS or the States to have accepted the AOD as valid, or point to any actual events reflecting such acceptance. The PACT Act does not require that UPS make any formal commitment to Congress, the Attorney General of the United States (who is vested with the authority to enforce the PACT Act), or States other than

58

New York. Nothing in the PACT Act requires UPS to acknowledge the AOD's enforceability outside of New York, or suggests that a mere announcement on the part of UPS that it would adopt a company-wide policy consistent with the AOD would qualify for the exemption. Moreover, the record contains no documents or testimony evidencing a legally binding commitment on the part of UPS to comply with the terms of the AOD within even a single State other than New York. And, again, the court's findings foreclose a conclusion that UPS, through its conduct, accepted the AOD's obligations as valid, since UPS extensively breached them.

Nor does the legislative history support any implication that Congress entered a grand bargain with UPS that would trade an exemption from the PACT Act for a commitment on the part of UPS to comply with the AOD nationwide, coupled with some implied congressional grant of authority to the States to enforce that commitment as third-party beneficiaries of the deal. Rather, the House Report tells us that the exemption was included because "[a]t the May 1, 2008 hearing on the bill, the Crime, Terrorism, and Homeland Security Subcommittee received testimony that [the AODs with UPS, FedEx, and DHL] were effective at stopping the illegal shipment of cigarettes to consumers." H.R.

59

Rep. No. 110–836, at 24 (2008). Thus, Congress agreed to exempt UPS from the

PACT Act because UPS represented that the measures it was taking to stop illegal

cigarette trafficking were *effective*, not in exchange for a promise to open itself up

to AOD liability, enforced by the States, nationwide—let alone for an

unenforceable verbal representation that ultimately proved unreliable. Nor is it

clear that the States would regard themselves as "beneficiaries" of any such

deal.[17]

Further, nothing in the AOD itself purports to bind UPS to obligations

outside of New York. The AOD expressly disclaims any right of New York to

seek penalties for violations outside of New York State. S. App'x at 508 ("UPS

shall pay to the State of New York a stipulated penalty of $1,000 for each and

every violation . . . provided, however, that no penalty shall be imposed if (a) the

---

[17] UPS's argument that Congress *sub silentio* granted every state attorney general
the authority to sue UPS under a contract to which neither Congress nor the
States are parties comes as a surprise to at least 18 states, the District of
Columbia, and Puerto Rico. *See* Amicus Brief of California Amici at 14 ("But New
York is the only State that has an agreement of this kind with UPS, and it is the
only State that can file suit should UPS breach it."). And indeed, under our
dissenting colleague's view, not only would other states be *permitted* to sue UPS
under a contract they played no role in negotiating, but they would in fact be
*required* to sue only under that contract and not the PACT Act once UPS has
claimed in litigation that the AOD should apply nationally. *See* Dissenting Op. at
11.

violation involves the shipment of Cigarettes to an Individual Consumer *outside the State of New York . . .*") (emphasis added). Indeed, the AOD expressly states that it grants rights and privileges only to the parties to the agreement. *Id.* at 511 ("This Assurance of Discontinuance shall not grant any rights or privileges to any persons or entity who is not a party to this Assurance of Discontinuance . . . .").

Thus, UPS's argument boils down to a simple proposition: that the mere existence of the AOD, and UPS's adoption of a cigarette policy, shield it from other liability regardless of whether UPS takes any steps to comply with them.[18]

---

[18] The dissent correctly points out that, under our interpretation, the same impermissible conduct by UPS gives rise to potential liability under three sources: the AOD, the PACT Act, and the PHL. Dissenting Op. at 10. However, we disagree with the dissent's suggestion that our acceptance of multiple sources of liability is inconsistent with our determination *infra* that the cumulative penalties imposed by the district court were excessive. *Id.* As detailed in III.C, *infra*, the damages imposed on UPS were excessive *on the facts of this case*; our interpretation of the PACT Act is not undermined by the possibility that a common carrier could face liability from multiple sources, particularly where the relevant statutes and the AOD take different, albeit related, approaches to addressing the problem of cigarette trafficking. *See, e.g.,* 15 U.S.C. § 376a(e)(2)(A) (prohibiting common carriers from delivering packages to persons whose names appear on the NCLs); PHL § 1399-*ll*(2) (prohibiting common carriers from transporting any cigarettes unless the recipient falls into one of three statutory exceptions); S. App'x 499-500 ¶¶ 21-22 (requiring UPS to develop and maintain an internal database of cigarette shippers). Whether and to what degree those penalties should be cumulated is a judgment to be made in the damage or penalty phase of litigation, and not by allowing a wrongdoer to elect which set of remedies it would prefer be imposed once it is sued. There are many legal

But that is not a reasonable reading of the statute, nor could it be what Congress intended.

As a textual matter, such a reading renders much of the language in the exemption provision superfluous. The exemption in question applies if (1) a common carrier is "subject to" an AOD with New York, 15 U.S.C. § 376a(e)(3)(A)(I); *and* (2) the AOD "is honored throughout the United States to block illegal deliveries to consumers," *id*. at § 376a(e)(3)(B)(ii)(I). If Congress had intended the exemption to turn solely on the AOD's mere existence, then it would have included just the first requirement, and exempted UPS from the PACT Act if it is merely "subject to" the AOD. UPS's interpretation effectively treats the "honored" requirement as surplusage. *See Dunn v. CFTC*, 519 U.S. 465, 472 (1997) (noting doctrine that statutes should not be construed to render their provisions mere surplusage); *Mary Jo C. v. New York State and Local Retirement*

contexts in which multiple overlapping sources of liability exist but a single punishment or measure of damages is appropriate. For example, defendants may be convicted on multiple related charges without consecutive sentences being appropriate. *See Whalen v. United States*, 445 U.S. 684, 692 (1980); *see also* 18 U.S.C. § 3584(b). In the civil context, plaintiffs may successfully pursue theories of negligence and breach of fiduciary duty but may not recover multiple damage awards for the same losses. *See Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 511 (2d Cir. 1994). So here.

*Sys.*, 707 F.3d 144, 156 (2d Cir. 2013) ("One of the most basic interpretive canons is that a statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (internal quotations and alterations omitted).

Treating the AOD's mere existence as an exemption from the PACT Act's compliance obligations would also thwart the statute's goal of blocking cigarette trafficking nationwide. *See* PACT Act, Pub. L. 111–154, § 1(c)(4), 124 Stat. 1087, 1088. Since New York is the only state with the power to enforce the AOD, and lacks the power to seek penalties for violations in other states, UPS's interpretation would enable it to deliver unlimited untaxed cigarettes in 49 of the 50 States without a remedy under the AOD, the PACT Act, or those States' own laws. Congress could not have intended its narrowly drawn exemption to give common carriers like UPS free rein to engage in the very wrongdoing that the statute was meant to prohibit.

The legislative purpose to block cigarette shipments illegal under state law, moreover, is not merely derived from extra-statutory legislative history. It is written into the language of the exemption provision itself as a modifier of the word "honor" that defines its meaning. Rather than leaving us to guess what

63

"honor" means, Congress specified that the exemption applies only if the AOD is "honored throughout the United States *to block illegal deliveries of cigarettes . . . to consumers.*" *Id*. at § 376a(e)(3)(B)(ii)(I) (emphasis added). Merely giving lip service to nationwide coverage of the AOD does nothing "to block deliveries." Deliveries are blocked only if UPS *complies* with the AOD. By specifying that the exemption applies if the AOD is honored in such a way as to "block illegal deliveries of cigarettes . . . to consumers," Congress clearly signaled that "honoring" the agreement involves compliance.

UPS's remaining objections to the standard applied by the district court in assessing whether UPS "honored" the AOD are meritless.

*First*, UPS asserts that application of the PACT Act's exemption cannot turn on whether it has in fact complied with the AOD, because such an inquiry would be "rudderless." Appellant's Br. at 37. It is true that the PACT Act does not define specifically how widespread and persistent violations would have to be to justify a conclusion that UPS was not "honoring" the AOD nationwide. That does not mean, however, that the courts are left without standards to apply. The district court here applied a reasonable test, combining the extent of the violations and the evidence of corporate failure to take reasonable steps to assure

compliance, to determine that the AOD was not "honored throughout the United States." Had a few UPS employees in one or even a few places corruptly or negligently failed to comply with the AOD, it would be perfectly reasonable to say that UPS had not "dishonored" the agreement. But when UPS as a corporation makes no serious effort to train or police its employees anywhere in the United States, it *has* failed to honor the AOD, particularly if that failure also results in widespread, flagrant non-compliance on the very home turf of the AOD: in New York. Whatever ambiguities might exist at the margins about whether the AOD may be "honored" in the face of intermittent or unintentional violations, UPS's flagrant and undisputed disregard of the AOD makes that question an easy one here. *See, e.g., Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (reaffirming that a party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others") (quotation marks omitted).[19]

---

[19] We accordingly reject our dissenting colleague's concern that UPS could be subjected to cascading penalties by a few violations of the AOD in "Rabbit County," or that the application of the PACT Act exemption turns on the complete success of its interdiction efforts. Dissenting Op. at 9. The district court determined that UPS was not honoring the AOD throughout the United States based on evidence of a virtually complete disregard of its obligations in New York, and a "lack of commitment to true, active AOD compliance [that] pervaded

*Second*, UPS objects that the district court's construction of the exemption provision violates due process because a common carrier will know only in retrospect whether it has engaged in "enough" misconduct to forfeit the exemption and would never be able to invoke the exemption successfully at any stage prior to trial. That UPS cannot know, without being subject to litigation, whether it is exempt from the PACT Act is not of grave concern. The PACT Act exemption was granted with the expectation that the AOD would be an effective substitute for the PACT Act requirements. New York (or any other plaintiff) can claim that the exemption is rendered inapplicable only in the context of litigation (as here) in which it charges widespread violations of the AOD. Thus, the issue of whether UPS is exempt from the PACT Act will arise only during litigation brought when a state's attorney general believes that the AOD has been flagrantly or frequently violated and that the exemption therefore does not apply but the PACT Act does. In other words, the PACT Act issue does not set UPS up

---

its corporate culture." 253 F. Supp. 3d at 604. Complete success at interdicting the shipment of untaxed cigarettes is not required; good faith, reasonably effective effort to comply with the AOD is. The AOD is not honored by a flagrant and pervasive disregard for its provisions.

for litigation from which it should be exempt.[20]

*Third*, UPS argues that the district court erased the words "throughout the United States" from the exemption provision because it made no findings regarding UPS's purported non-compliance in any jurisdiction other than New York. UPS is correct that "throughout the United States" clearly means in all States, not just New York. But the PACT Act grants an exemption when UPS affirmatively *honors* the obligations of the AOD throughout the country; it does not revoke an otherwise applicable exception only when UPS *dishonors* the AOD everywhere in the United States. We are not persuaded that UPS honored the agreement "throughout the United States" when it took no, or only hopelessly ineffective, steps to comply with the AOD in New York, and the record evidence shows that at least some of the breaches were national in scope, thus establishing

---

[20] For that reason, we do not share Judge Jacobs's concern about the fact that our interpretation would require the exemption to be sorted out in litigation. *See* Dissenting Op. at 9. The availability of a defense is often dependent on facts that cannot be known until they are determined through litigation. The PACT Act exemption is an exemption from liability, not from litigation; the exemption does not purport to grant immunity from being sued. And even a defense, such as qualified immunity, that *is* an immunity from litigation has to be litigated: public officers are called to court to account for their conduct and the legal standard for immunity in many cases cannot be applied until the facts can be established, at summary judgment or even at trial. Like UPS, public officials often cannot know whether they are immune from litigation until the issue has been litigated.

widespread breaches of the agreement. *See, e.g.*, J. App'x 658 (lack of formal audit policy); J. App'x 640-41 (cursory training of drivers); J. App'x 811, 1331 (shipment of cigarettes across nation).

Our dissenting colleague adopts an interpretation that has never been advanced by UPS itself, or by any other party or amicus curiae. Judge Jacobs would have us find that UPS "honors" the AOD once it confirms in any litigation that it intends to be bound by the AOD across the nation. Dissenting Op. at 8. Prior to such confirmation, the exemption would be available as a discretionary shield against claims brought by any of the other 49 states, which UPS may choose to invoke, or not, based on tactical considerations in the litigation. Dissenting Op. at 7-8.

As demonstrated above, nothing in the statutory language, the legislative history, or sound policy suggests that the exemption should apply based on a mere verbal commitment by UPS to comply with the AOD throughout the country; moreover, the record shows that at no time between the enactment of the PACT Act in 2010 through the filing of this lawsuit in 2015 did UPS make any such verbal commitment. The dissent nevertheless embraces the theory that a verbal commitment to the AOD suffices and, in an attempt to avoid the

embarrassing fact that UPS never even made a public commitment prior to this lawsuit, asserts that UPS was not required to do so until confronted with litigation charging that it violated the PACT Act. Under the dissent's approach, in such an enforcement action UPS could make its own tactical decision to disclaim the national application of the AOD and compel a plaintiff state to proceed under state law, or to embrace national application and compel the state to proceed under the AOD, depending on which regime's liability and penalty provisions were more favorable to it. The dissent apparently would then allow UPS to change its position in subsequent litigation brought by a different state, and pledge future compliance nationally with the AOD, in order to invoke its PACT Act exemption if the AOD scheme were tactically preferable to UPS in that litigation. Only from that point on would the dissent apply the principles of judicial estoppel to require UPS to comply with the AOD in other states and exempt UPS from litigation under either the PACT Act or any state laws relating to cigarette trafficking. Such an approach would leave UPS free to disregard the AOD throughout the United States, yet retain its exemption from the PACT Act and the state regulations it preempts, until it is caught violating its obligations under one or the other regime – and even at that point, to elect which set of rules

69

and remedies would apply. We cannot think of any other regulatory regime that applies in such a manner or provides such tactical advantages to an entity that violates its obligations under federal and state statutes as well as a settlement agreement to which it had freely agreed.[21] We do not believe that Congress intended such an anomalous result.

We conclude that as a matter of law, the clear meaning of the exemption is that UPS is exempt only if it in fact substantially complies with the AOD throughout the country. We also conclude that the district court's well-supported specific findings regarding UPS's failure, at a nation-wide corporate level, to take reasonable steps to assure compliance *anywhere*, and its widespread, well-documented violations of its obligations in New York, amply support its broader factual conclusion that UPS did not honor the AOD "throughout the United States," as it was required to do to be exempt from the PACT Act. Accordingly,

---

[21] The dissent's construction is also inconsistent with its own expressed concern that our interpretation leaves the availability of the exemption unknowable until a case is litigated. Dissenting Op. at 9. Under the dissent's view, whether UPS intends to comply with the AOD is not determined until it is sued for violating state law or the PACT Act, at which time UPS has an option as to which regime (the AOD or the federal and state statutes) should be applied to its past and future conduct. It seems to us that the burden of any uncertainty in this regard should fall on the wrongdoer, and not on the States that would not know in advance what rules govern UPS's behavior within their borders.

we affirm the district court's liability determination with respect to the PACT Act and PHL § 1399-*ll*.

## B. UPS is Liable for Violations of the AOD's Audit Requirement.

The district court found that UPS violated its audit obligation under the AOD and imposed the AOD's $1,000 per-violation penalty for each package that UPS shipped on behalf of the Liability Shippers after it had a "reasonable basis to believe" that such Liability Shipper was "tendering Cigarettes for delivery to Individual Consumers." *United Parcel Service, Inc.*, 2017 WL 2303525 at *5. That finding resulted in penalties of roughly $80.5 million due to the State, for 80,468 packages.

On appeal, UPS argues that (1) the AOD's stipulated penalty provision does not apply to audit violations at all; and (2) even if it does, it authorizes a maximum penalty of only $1,000 for each Liability Shipper, or $20,000 in total. We disagree with UPS's first argument and therefore affirm the district court's findings of liability for violating its audit obligation under the AOD. We agree with UPS's second argument, however, and therefore reduce the penalty imposed by the district court.

Because the AOD is a settlement agreement, its provisions are interpreted

71

under general contract principles. *See MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 170–71 (2d Cir. 2011). We enforce the AOD according to the plain meaning of its terms. *Id*. at 171.

Paragraph 24 of the AOD, titled "Audits," states that:

> UPS shall audit shippers where there is a reasonable basis to believe that such shippers may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the shippers are in fact doing so.

S. App'x at 501. Paragraph 42 of the AOD, coming under the heading "Enforcement, Penalties and Costs," provides that:

> UPS shall pay to the State of New York a stipulated penalty of $1,000 for each and every violation of this Assurance of Discontinuance occurring after the Effective Date; provided, however, that no penalty shall be imposed if (a) the violation involves the shipment of Cigarettes to an Individual Consumer outside the State of New York, or (b) the violation involves the shipment of Cigarettes to an Individual Consumer within the State of New York, but UPS establishes to the reasonable satisfaction of the Attorney General that UPS did not know and had no reason to know that the shipment was a Prohibited Shipment.

S. App'x at 508.

By its plain language, the penalty provision extends to violations of the

72

AOD's audit requirement. It straightforwardly provides for penalties for *all* violations of the AOD. The term "violation" means "[a]n infraction or breach of the law" or "the contravention of a right or duty." BLACK'S LAW DICTIONARY (11th ed. 2019). The provision's sweeping reference to "each and every violation" plainly envisions penalties for violations of every type of obligation imposed on UPS by the AOD, including violations of UPS's auditing duty. Neither of the two exemptions from the penalty provision apply to auditing violations.

UPS argues that the necessary inference from the two exemptions to the penalty provision is that the provision was meant to apply only to UPS's knowing shipment of cigarettes within New York State. But the scope of the exemptions to a provision do not necessarily define the scope of that provision itself. To the contrary, the existence and scope of the exemptions here support the opposite conclusion. The drafters of the AOD plainly knew how to exempt certain violations and did so. Those exemptions, however, are limited to certain types of violations involving shipments of cigarettes. That no exemption is provided for any category of violations of the audit requirement or of any of the other record-keeping or other obligations agreed to by UPS confirms that "each and every violation" of the audit duty, without exception, is subject to penalties.

*See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (2014)

(omission of language from contractual provision leads to "inescapable

conclusion" that "parties intended the omission").[22]

---

[22] UPS also points to other parts of the AOD to support its definition of "violation." For example, it notes that the definition of "Alleged Past Violations"—the obverse of future "violations"—is UPS's delivery of "packages containing cigarettes to persons who were not authorized to receive them pursuant to PHL § 1399-*ll* in violation of PHL § 1399-*ll*(2)." Appellant's Br. at 50. But the definition of "Alleged Past Violations" cannot be relevant to the definition of a violation of the AOD. A *past* violation could only be a violation of PHL § 1399-*ll*, because past violations, by definition, must have occurred before the AOD came into existence. The AOD created *additional* obligations with which UPS was required to comply, and imposed penalties for violations of *those* obligations, not simply for violations of pre-existing statutory duties.

UPS also notes that the AOD defines "Potential Violations" only as shipments. But that is a non-sequitur. The AOD does not treat "Potential Violations" as a defined term. The term "Potential Violations" appears in the AOD only as part of a section titled "Response to Notice of Potential Violation." That section describes the measures UPS should take in response to a notice from the NYAG to UPS that one of its customers is shipping cigarettes to individual consumers. *See* S. App'x at 507 ¶ 39. Any reference to a "violation" in that section thus clearly refers to a customer's violation, which can only be a "violation of UPS's Cigarette Policy." UPS, by contrast, can commit many other kinds of violations of the AOD, because the AOD imposes obligations on UPS beyond simply complying with PHL § 1399-*ll* or its own Cigarette Policy.

Indeed, the "Definitions" provision of the AOD specifically defines "Prohibited Shipment" as "any package containing Cigarettes tendered to UPS where the shipment, delivery, or packaging of such Cigarettes would violate Public Health Law § 1399-*ll*." S. App'x at 498. If the AOD were intended, as UPS claims, to define violations only as the knowing shipment of cigarettes, then the penalty provision could have been written to say that "UPS shall pay to the State of New York a stipulated penalty of $1,000 for each and every Prohibited

74

Further, it is entirely consistent with the context in which the AOD was negotiated that UPS would face penalties for violations of the AOD's various procedural and prophylactic requirements. In consideration for the cessation of the State's investigation into UPS's alleged past unlawful cigarette shipments, UPS agreed to take on certain new contractual obligations. The AOD is an attempt to establish a comprehensive and interdependent set of obligations that collectively reduce the likelihood that UPS will ship packages containing cigarettes. To read the term "violation" as limited to the knowing shipment of cigarettes would mean that UPS could fail to comply with any of the host of other obligations without consequence. Insulating UPS from liability for violations of any of these provisions would thwart the AOD's purpose.[23]

---

Shipment it makes" instead of using the much more general phrase "each and every violation."

[23] UPS claims that because the AOD is a contract with the State, the State's remedy for a breach was to seek actual damages in a breach of contract action. But the contract itself specifies the penalties that UPS agreed to pay for "each and every violation." UPS argues that applying the penalty provision to audit violations would be "unconscionable" because it then would mandate penalties for "minor" or "ministerial" breaches of the AOD. Appellant's Br. at 53. But contrary to what UPS claims, the district court did not hold that the State could recover a stipulated penalty of $1,000 for *any* breach of *any* obligation in the AOD, whatever the gravity of the breach or UPS's scienter, and neither do we. Auditing is a core compliance mechanism of the AOD, the breach of which

Once we accept that the penalty provision covers violations of UPS's audit duty, the question becomes just how much liability UPS incurs for its failure to audit the Liability Shippers. The district court translated liability for failure to audit into a penalty for each package of cigarettes that was shipped after UPS should have audited but did not—in effect treating each unaudited package as a separate violation of the audit requirement. UPS argues that this was error because, at most, UPS breached the audit provision once per shipper.

We agree with UPS that the audit provision applies to shippers, not shipments. By its plain terms, the audit provision is shipper-oriented. It requires UPS to "audit *shippers* where there is a reasonable basis to believe that such *shippers* may be tendering Cigarettes for delivery to Individual Consumers, in order to determine whether the *shippers* are in fact doing so." S. App'x at 501 ¶ 24 (emphasis added).

If UPS had a reasonable basis to believe that Shipper X was shipping

imperils other aspects of the overall compliance scheme. A failure to audit suspected cigarette shippers deprives UPS of valuable knowledge of what its customers are actually shipping, which in turn stymies UPS's duty to suspend or terminate the accounts of known cigarette shippers, and ultimately its ability to enforce the ban on cigarette deliveries to consumers. Whether there exists a category of *de minimis* violations of the AOD for which a court may reject a demand for a stipulated penalty is a question not posed by this case.

76

cigarettes on January 1, then UPS should have audited Shipper X on January 1.

That UPS's obligation to audit Shipper X remained in effect on January 2, when

UPS continued to ship unaudited packages of cigarettes for Shipper X, does not

mean UPS committed a second violation. The violation is single and continuous

until UPS purges the obligation by actually conducting an audit.

At any rate, the plaintiffs do not argue, and the district court did not find,

that UPS committed a separate audit violation on every day or every week or

every month that UPS failed to audit, once it had a reasonable basis to believe

that a particular shipper was sending cigarettes to individual consumers. Rather,

they argue, and the district court concluded, that every *package* shipped by a

seller who should have been audited constitutes a separate violation of the audit

requirement. But that is simply not what the AOD provides. While knowingly

delivering cigarettes to an individual consumer may violate a different provision

of the AOD, *see* S. App'x at 498–99 ¶ 17, the audit provision itself requires an

*audit*. It does not provide (as the parties could have provided if they so intended)

that every shipment by a shipper who should have been audited but was not

constitutes a violation of the AOD.

Thus, a failure to audit a shipper results in only one penalty—a penalty for

failing to audit that shipper.[24] The district court found, and UPS does not contest, that UPS failed to audit all 20 Liability Shippers. Therefore, the penalty for violations of UPS's audit obligations under the AOD should have been $20,000. We therefore vacate the district court's $80.5 million penalty award and modify this judgment to impose a penalty of $20,000 under the AOD.

### C. UPS Violated the CCTA by Knowingly Transporting More Than 10,000 Unstamped Cigarettes.

The district court held that UPS was liable under the CCTA for knowingly transporting "contraband cigarettes," *see* 18 U.S.C. § 2342(a), which are defined as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes," *id*. at § 2341(2). Specifically, the district court found that for certain cigarette manufacturers, UPS routinely delivered cigarettes in lots of 10,000 or more, and that for others of the Liability Shippers, the number of unstamped cigarettes UPS transported far exceeded 10,000 in total.

---

[24] The plaintiffs protest that a $1,000 penalty per shipper, rather than per shipment, would render the AOD's audit requirement toothless. But the low penalties here result merely from the plaintiffs' concession that they were seeking penalties under the AOD for violations *only* of the audit requirement. The plaintiffs chose to forego their right to seek penalties for UPS's violations of other provisions of the AOD.

UPS argues that the district court committed legal error in assessing UPS's

liability under the CCTA. *First*, UPS contends that the district court erred in

aggregating separate shipments to meet the CCTA's quantity requirement for

certain of the Liability Shippers. It claims that the CCTA's use of "*a quantity*"

—singular—"in excess of 10,000 cigarettes" criminalizes only a single act of

transporting 10,000 cigarettes. Appellant's Br. at 63 (emphasis in original). *Second*,

UPS contends that it cannot be held liable under this reading of the CCTA

because there was no proof that it knew that any one delivery exceeded 10,000

unstamped cigarettes.

We reject UPS's interpretation of the statute. The plain text of the CCTA's

definition of "contraband cigarettes" imposes no per-transaction requirement,

and the use of the indefinite article "a" in the phrase "a quantity" does not

necessarily signify a singular shipment. Referring to "a quantity" of something

does not, in common parlance, preclude aggregation.[25] It makes perfect sense to

---

[25] The district courts within this Circuit have all been of the view that aggregation is permissible under the CCTA. *See, e.g., City of New York v. FedEx Ground Package System, Inc.*, 91 F. Supp. 3d 512, 520 (S.D.N.Y. 2015) ("Defendant's interpretation of Section 2341(2) conflicts with the plain, unambiguous text of the CCTA which imposes no 'in a single transaction requirement.'") (internal quotation marks omitted); *City of New York v. LaserShip, Inc.*, 33 F. Supp. 3d 303, 313 (S.D.N.Y. 2014) ("The text of the CCTA is unambiguous. It provides that 'a quantity in

say that a shipper who makes more than ten 1,000-cigarette deliveries has delivered "a quantity" of more than 10,000 cigarettes, just as a child receives "a quantity" of presents for her birthday comprising what she receives from each individual guest at her birthday party, through the mail, or during personal visits from other well-wishers before or after the day of the party.[26]

---

excess of 10,000 cigarettes' constitutes contraband. It says nothing to suggest that the relevant quantity must be found in a single transaction.") (internal citations omitted); *City of New York v. Gordon*, 1 F. Supp. 3d 94, 103 (S.D.N.Y. 2013) (same); *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08–CV–3966 (CBA), 2009 WL 2612345, at *35 (E.D.N.Y. Aug. 25, 2009) ("In any event, the Court rejects the view that defendants can sell unlimited quantities of unstamped cigarettes so long as they avoid making any single sale in excess of 49 cartons. Nothing in the CCTA provides that for cigarettes to be considered contraband they must be sold in a single transaction.").

[26] We are mindful that the aggregation principle creates certain puzzles or anomalies. If a person subject to the CCTA ships one package of 5,000 unstamped cigarettes, she has not violated the CCTA because the 5,000 unstamped cigarettes are not "contraband cigarettes." But if she later ships another package with 5,001 unstamped cigarettes, that package contains contraband cigarettes and the cigarettes in the earlier package retroactively become contraband cigarettes.

There is also a line-drawing problem. To the extent aggregation is permissible in principle, there will be extreme cases where shipments of unstamped cigarettes are spread out in time and space such that it does not make sense to categorize them as "a quantity." But wherever the line should be drawn in time and space, this case does not present a close call. UPS maintained accounts for shippers setting themselves up in business for the purpose of selling significantly more than 10,000 unstamped cigarettes, who then did indeed ship far more than 10,000 unstamped cigarettes on a regular and consistent basis over an extended but compact period of time. Those shippers, and consequently UPS

As the district court explained in *FedEx*, "[t]his view is supported by the fact that other CCTA provisions *do* contain an explicit per-transaction requirement, and therefore it should be presumed that Congress acted intentionally and purposefully in excluding such a requirement from [the definition of contraband cigarettes]." 91 F. Supp. 3d at 520 (emphasis in original). For example, the CCTA makes it unlawful "for any person knowingly to make any false statement or representation with respect to the information required by this chapter to be kept in the records of any person who ships, sells, or distributes any quantity of cigarettes in excess of 10,000 *in a single transaction*." 18 U.S.C. § 2342(b) (emphasis added); *see also id.* at § 2343(a) (record-keeping requirements for any single transaction of over 10,000 cigarettes); *id.* at § 2343(b) (reporting requirements for persons processing more than 10,000 cigarettes in a month). That Congress included single-transaction or specific time-frame qualifiers in other CCTA provisions but not in 18 U.S.C. § 2341(2) further supports our conclusion that aggregation is permissible for the purposes of meeting the definition of "contraband cigarettes." *See Russell v. United States*, 464 U.S. 16, 23

---

as their aider and abetter, cannot avoid liability by claiming that they organized all (or most) of their shipments to contain 10,000 or fewer unstamped cigarettes.

(1983) (presuming Congress acted intentionally in omitting term included in other provisions of statute).

Since we hold that the CCTA delivery prohibition contains no single-transaction requirement, UPS's argument that it did not have knowledge that any particular shipment contained a quantity in excess of 10,000 unstamped cigarettes is beside the point. UPS does not contend it had no knowledge that the Liability Shippers shipped more than 10,000 unstamped cigarettes in the aggregate.

We therefore affirm the district court's determination that UPS violated the CCTA by knowingly shipping contraband cigarettes for the Liability Shippers.

## III. The Damages and Penalties Awards

UPS argues that even if we sustain one or more of the liability theories, we should reverse the damages and penalties awards. *First*, it argues that the district court erred in denying its motion to preclude the plaintiffs' damages evidence because the plaintiffs failed to provide UPS with a robust pre-trial damages computation pursuant to Fed. R. Civ. P. 26, and erred in awarding damages and penalties because the plaintiffs failed to prove any damages at trial. *Second*, it argues that the district court adopted a diversion rate in its compensatory damages calculation that was not supported by the evidence. *Third*, it argues that

the penalty award imposed by the district court is grossly disproportionate to the loss suffered by the plaintiffs and the gains received by UPS for the conduct at issue.

In contrast, the plaintiffs cross-appeal, arguing that the district court should have awarded them the full amount of unpaid State and City taxes on cigarettes shipped by UPS under the PACT Act or CCTA without applying any diversion rate. We address each of these arguments in turn.

A. **The District Court Did Not Abuse Its Discretion in Allowing the Plaintiffs to Present Their Damages Case Nor Did It Clearly Err in Making Factual Findings Based on Record Evidence.**

UPS raises several challenges with respect to the way the plaintiffs presented their damages and penalties case from discovery through their post-trial submission, as well as to how the district court held the plaintiffs to their burden of proof. UPS complains that: (1) before trial the plaintiffs failed to inform them of the amount or the process by which they would calculate their damages and penalties claims, in violation of Rule 26; (2) during trial the plaintiffs did not adequately prove their damages and penalties claims; and (3) it was error for the district court to order the plaintiffs to submit additional information post-trial to calculate the quantum of damages and penalties. For the reasons explained

below, we are unpersuaded that the district court abused its discretion in allowing the plaintiffs to present their damages case, in making factual findings based on the trial record, or in ordering the parties to submit calculations post-trial.

### 1. The District Court Reasonably Refused to Strike the Plaintiffs' Entire Damages and Penalties Case.

UPS appeals from the district court's denial of its Rule 26 motion, which it renewed post-trial, complaining that the court should have precluded the plaintiffs' damages evidence entirely. We disagree with UPS and conclude that the district court did not abuse its "broad latitude" in managing discovery, or in failing to impose discovery sanctions on the plaintiffs. *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012); *Argo Marine Sys., Inc. v. Camar Corp.*, 755 F.2d 1006, 1015 (2d Cir. 1985).

Rule 26 requires a plaintiff to disclose "a computation of each category of damages claimed," and to provide an opportunity for the defendant to review the evidence used to calculate damages. Fed. R. Civ. P. 26(a)(1)(A)(iii). Rule 37(c)(1) provides that a failure to comply with Rule 26(a)'s disclosure obligations results in preclusion of the evidence "unless the failure was substantially justified

84

or harmless." Fed. R. Civ. P. 37(c)(1).

The district court denied UPS's pretrial motion to bar monetary relief, viewing "the overall record as sufficiently placing UPS on notice as to the damage[s] theory." J. App'x at 443. In adhering to that ruling after trial, the district court reaffirmed that UPS had "adequate pre-trial notice to counter plaintiffs' damages claim." *United Parcel Service, Inc.*, 253 F. Supp. 3d at 687. In essence, this was a ruling that any Rule 26 violation that may have occurred was "harmless." *See* Fed. R. Civ. P. 37(c)(1).

On appeal, UPS contends that it was substantially prejudiced by the plaintiffs' limited Rule 26(a) disclosure because "[t]he number of packages, and the derivative number of packages containing unstamped cigarette cartons, transported by UPS constituted the determinative measure of both compensatory damages and penalties" and "[t]hus, disclosure of the methodology and evidence supporting those calculations was critical to UPS's defense." Appellant's Br. at 76. But that is the very same argument that the district court rejected after holding (1) that the plaintiffs provided this exact information for the Arrowhawk Group, (2) that because UPS "knew the [other] shippers, it could easily locate the same types of documents for each, and it knew plaintiffs' general methodology," and

85

(3) that "the calculations were ultimately based on known data points: penalty ranges generally set forth in the AOD and statutory schemes at issue, and compensatory damages based on the statutory tax rate imposed on each carton of cigarettes." *United Parcel Service, Inc.*, 253 F. Supp. 3d at 686–88.

By the time of trial, UPS knew that the plaintiffs would rely on UPS's spreadsheets to prove that UPS delivered packages for shippers on the federal NCLs in violation of the PACT Act, and that they would pursue per-package penalties for those violations. Similarly, UPS knew that the plaintiffs would be seeking AOD penalties "for each package that UPS failed to audit in accordance with Paragraph 24 of the AOD." J. App'x at 425. And UPS knew that, based on package counts and proof of contents, the plaintiffs would be seeking per-package penalties under PHL § 1399-*ll* and unpaid taxes under the CCTA and PACT Act.

In sum, the plaintiffs disclosed their damages *theory* from the beginning; made clear to UPS throughout the discovery period that UPS's own internal spreadsheets would be key *documents* used to prove total damages;[27] notified UPS

---

[27] Plaintiffs questioned a UPS witness "extensively" (UPS's word) on the spreadsheets, and UPS heard from plaintiffs' own Rule 30(b)(6) witness that damages would be computed based on those documents. J. App'x at 198.

that plaintiffs would rely on direct and circumstantial *evidence* to prove package contents; and provided a *computation* of damages for an exemplar shipper group. In contrast to a situation in which damages data are reasonably known only to the plaintiff—e.g., loss of future profits or physical injuries—here the damages related to UPS's own historical shipping activities, as derived from UPS's own internal records. We agree with the district court that UPS was well-positioned to respond to claims about what it had shipped and with what frequency.

Whether or not we would have required the plaintiffs to provide more than only an exemplar of the full amount of their damages and penalties had we been in the district court's position is of no moment; management of the discovery process is confided to the sound discretion of the district court. Here, the judge who oversaw the discovery process and trial acted well within her discretion in concluding that UPS did not "suffer[] any real prejudice" from the lack of a more robust disclosure. *United Parcel Service, Inc.*, 253 F. Supp. 3d at 687. Therefore, it was not error for the district court to allow the plaintiffs to present evidence of damages and penalties at trial.

## 2. The District Court's Factual Findings on Damages and Penalties Were Supported by the Evidence.

In order to prove damages and liability for penalties in this case, the plaintiffs were required to prove how many packages of cigarettes UPS shipped. To do this, the plaintiffs provided the court with UPS's own spreadsheets reflecting how many packages UPS shipped for each Liability Shipper, as well as direct and circumstantial evidence showing what percentage of the packages UPS shipped for each Liability Shipper contained cigarettes. The district court held that the spreadsheets, which UPS itself had generated and produced during discovery, were sufficient to prove the *quantity* of packages underlying the damage and penalty calculations for all claims. The district court also made reasonable inferences about package *contents* from various pieces of both direct and circumstantial evidence put forth by the plaintiffs.

On appeal, UPS contends that the plaintiffs' proof of damages and penalties at trial was insufficient. The thrust of UPS's argument is that the plaintiffs never presented a witness—fact or expert—to testify about their damages and penalties calculations.

### (i)  Package Quantity

UPS's complaint regarding the plaintiffs' use of UPS's own spreadsheets to calculate the number of packages it shipped for each of the Liability Shippers rings hollow. The spreadsheets, produced in Excel format, contain fields showing the unique shipper number, the date a package was picked up, the state and zip code of delivery, and the actual or billed weight of every package. They were generated by UPS "specifically for this litigation" in response to plaintiffs' request for information about UPS's delivery services for cigarette dealers. J. App'x at 199. Along with the spreadsheets, UPS produced a data dictionary defining the terms in the spreadsheet column headings.

Prior to trial, the court overruled UPS's foundational objection to the spreadsheets' admission because UPS had stipulated to their authenticity. The court explained that UPS made only a foundational objection and did not object to the spreadsheets as irrelevant or hearsay. Consequently, the plaintiffs could offer the spreadsheets without the need for a sponsoring witness. At trial, the spreadsheets and data dictionaries were admitted into evidence without accompanying testimony. UPS chose not to submit a witness to explain what it understood the spreadsheets to mean or not to mean.

At trial, and now, UPS challenges whether the spreadsheets are a reliable indicator of the overall number of packages shipped. But UPS produced these spreadsheets in the first instance in response to plaintiffs' requests for information about shipment counts. Assuming that UPS faithfully complied with its production obligations, it cannot now assert that its own documents did not in fact answer the questions to which UPS represented they were responsive.

The data contained in UPS's spreadsheets themselves, in conjunction with the UPS data dictionaries, provided a reasonable basis upon which to tabulate the number of packages shipped and determine when they were shipped.[28] Once evidence has been admitted as relevant and authentic, a factfinder has broad latitude to determine the weight the evidence deserves. Any lack of supporting testimony describing business records already established as authentic "is relevant only as to the weight to be accorded such records." *Stein*

---

[28] UPS also contends that the district court erred in accepting the plaintiffs' method for tabulating the package and carton counts. The plaintiffs sorted the spreadsheets by account number (i.e., shipper), eliminated duplicates, and added up the packages shipped. UPS made certain objections to this methodology which the court addressed. The court agreed with UPS that packages weighing less than one pound were unlikely to contain cigarettes and thus should be excluded from the tabulation and that packages being delivered to a cigarette shipper, rather than delivered by a shipper, should also be excluded.

*Hall & Co. v. S.S. Concordia Viking*, 494 F.2d 287, 292 (2d Cir. 1974). Moreover, a factfinder's damages calculation need only have a "reasonable basis." *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992).

That the parties' counsel made conflicting arguments about what the spreadsheets proved, and that the district court resolved those disputes as trier of fact, is entirely unremarkable. Choosing among "competing inferences that can be drawn from the evidence" is the factfinder's province. *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998). "[W]e defer to the fact finder's determination of the weight of the evidence and the credibility of the witnesses and to the fact finder's choice of the competing inferences that can be drawn from the evidence." *United States v. LaSpina*, 299 F.3d 165, 180 (2d Cir. 2002) (internal quotations and alterations omitted). UPS has not come close to establishing that the district court's findings were clearly erroneous.

### (ii)    Package Contents

With respect to package contents for six of the Liability Shippers, the plaintiffs submitted direct evidence of contents, consisting of order forms, shipping invoices describing package contents, driver summaries, packing slips, and daily report printouts, as well as direct testimony and admissions in a federal

91

plea agreement. For the remaining eleven cigarette shippers, plaintiffs provided circumstantial evidence of package contents. The district court found that there was ample evidence as to each Liability Shipper to (1) support the fact that packages contained cigarettes and (2) reasonably approximate the percentage of each Liability Shipper's packages that contained cigarettes.

UPS complains that the plaintiffs offered shifting and inconsistent theories to prove package contents and that the plaintiffs did not prove the number of cigarette cartons UPS shipped with mathematical precision. As an initial matter, UPS was well aware that the plaintiffs intended to rely on both circumstantial and direct proof of the contents of what UPS calls the "plain brown boxes" it transported. *See* Appellant's Br. at 1 & 46. Plaintiffs' interrogatory responses, served nearly a year before trial, previewed that they would use circumstantial evidence such as tracer inquiries, the results of UPS's eventual audits, and shippers' placement on the NCL to prove the contents of packages UPS shipped for the Liability Shippers.

Again before trial, in the Arrowhawk Letter, the plaintiffs identified the types of circumstantial evidence that they would rely on at trial to prove the contents of packages UPS shipped for the Liability Shippers. At trial, the

plaintiffs presented, and the district court relied on, circumstantial evidence of package contents such as reports from UPS drivers, tracer inquiries, results of UPS's belated audits, controlled buys of cigarettes by City investigators, the presence of certain shippers on the federal NCL, and the shippers' overall product lines. In its liability opinion, the district court examined the evidence with respect to each Liability Shipper and then made an assessment, on a shipper-by-shipper basis, as to what percentage of each Liability Shipper's packages contained cigarettes. UPS challenges the approach in concept, rather than lodging a specific challenge to any of the district court's factual determinations.

As an initial matter, there was nothing impermissible about the plaintiffs' reliance on circumstantial evidence to prove their case. *See United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989) ("Circumstantial evidence . . . is of no lesser probative value than direct evidence."). Indeed, such proof may have been the only proof available here given that, like other wrongdoers, cigarette traffickers do not commonly create or retain records of their criminal activities or testify without asserting their right to self-incrimination.

Moreover, UPS had every opportunity to challenge—and did

challenge—the circumstantial evidence that the plaintiffs proffered. UPS argued to the district court at length that the evidence did not show either that the packages it shipped contained cigarettes or that UPS knew that the businesses were shipping cigarettes.

To the extent that the district court could not pin down the precise number of cigarette cartons each Liability Shipper shipped, the responsibility lies at UPS's own door. *See Raishevich v. Foster*, 247 F.3d 337, 343 (2d Cir. 2001) ("If the plaintiff's inability to prove an exact amount of damages arises from actions of the defendant, a factfinder has some latitude to make a just and reasonable estimate of damages based on relevant data.") (internal quotation marks omitted); *Sir Speedy, Inc.*, 957 F.2d at 1038 (explaining that a claimant "need not prove the amount of loss with mathematical precision"). UPS had a contractual audit obligation, as well as other legal obligations, not to ship stamped or unstamped cigarettes to individual consumers. UPS cannot accept contraband cigarettes for shipment, look the other way, and then demand exacting proof of what was inside the packages that it controlled. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565 (1931) (when uncertainty in proving damages is caused by the defendant's own wrongful act, "justice and sound

public policy alike require that he should bear the risk of the uncertainty thus produced"); *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1118 (2d Cir. 1986) ("When a difficulty faced in calculating damages is attributable to the defendant's misconduct, some uncertainty may be tolerated.").

We therefore conclude that the plaintiffs' evidence was sufficient to establish liability and damages and the district court's approach to making factual determinations based on the record evidence was entirely reasonable.

### 3. The District Court Did Not Err By Ordering the Parties to Submit Post-Trial Calculations of Damages and Penalties.

In its liability opinion, the district court ordered the parties to provide the court with a calculation of the quantity of packages and cartons UPS shipped for each Liability Shipper. The liability opinion directed the parties to apply the relevant dates, definitions, and findings provided by the court to the data provided in the spreadsheets so that the court could assess the precise "quantum" of damages and penalties to be awarded. Per the court's order, the plaintiffs submitted a detailed calculation of the packages and cartons UPS shipped for each Liability Shipper, including the specific exhibits admitted during trial that the plaintiffs used to identify the package and carton figures. On

the other hand, UPS, in defiance of the court's order, submitted a calculation for only three of the Liability Shippers. Because UPS failed to comply with the court's order, the court "calculate[d] its determination of damages and penalties using the uncontested numbers of Packages and Cartons supplied by plaintiffs where appropriate." *United Parcel Service, Inc.*, 2017 WL 2303525 at *2.

UPS claims that by ordering the parties to submit post-trial calculations, the district court reopened the record, "stepped into the role of expert witness and created a previously undisclosed, untested, and unsupported methodology on which to base damages and penalties." Appellant's Br. at 87. Despite UPS's hyperbolic protestations, this course of action was a reasonable method of ensuring that both sides had an opportunity to apply the court's factual findings to the evidence in the record.[29]

UPS's claim that the district court reopened the record *sua sponte* after trial is incorrect. The record was never reopened; the court simply directed the parties

---

[29] *See United States v. Global Distributors, Inc.*, 498 F.3d 613, 620 (7th Cir. 2007) ("Although the district court gave Global an opportunity to file a memorandum on damages, and Global availed itself of that option, Global did not 'challenge[] the arguments in the government's damages memorandum.' Instead, it continued to present excuses for its underlying behavior. The district court thus took as undisputed the facts in the government's memorandum and drew inferences from those facts.") (alteration in original).

to apply the court's definitions and findings to the already admitted evidence to assist the court in calculating the "quantum" of relief. The information contained in both parties' post-trial submissions derived from evidence that had already been admitted into the record and which UPS had ample opportunity to challenge or explain. As is not unusual in a bench trial, the court requested supplementary *argument* from the parties, not additional *evidence*.

We also agree with the district court that, contrary to UPS's argument, the type of analysis conducted in the post-trial submissions did not require expert testimony. UPS emphasizes that the spreadsheets were large and unwieldy. But the parties, with the help of Excel, were easily capable of conducting the simple arithmetic calculations that the district court ordered.[30]

UPS also complains that by ordering it to conduct and submit a calculation of the packages containing cigarettes—information that would be used to punish

---

[30] It is true that the district court ordered the parties to remove duplicate entries and packages weighing under one pound, which required some human manipulation in the Excel program. But that the district court accepted UPS's arguments as to why certain packages in the spreadsheets should not be counted does not mean that the plaintiffs were unable to perform the calculation without an expert. Had the district court not given UPS the chance to submit its own calculation or to verify the plaintiffs' calculations, we would be more concerned about potential error. But UPS had every opportunity to refute the calculations proffered by the plaintiffs.

UPS financially—the district court violated the principle of party presentation and shifted the burden of proof. The court's order did not shift the burden of proof onto UPS. The evidence and theories of damages and penalties had been put forth by the plaintiffs. All the court ordered UPS to do was to submit, if it so chose, its contentions regarding the numbers of packages and cartons as they were defined in the liability opinion. By that time, the plaintiffs had already met their burden of proof on damages. What remained was to plug in the damage and penalty calculations based on information in the record.

### B. The District Court Erred in Awarding the Plaintiffs Only Half of the Unpaid Taxes on Cigarettes UPS Unlawfully Shipped.

The district court awarded the plaintiffs a total of $9.4 million in damages for unpaid cigarette taxes.[31] The court recognized that both the PACT Act and CCTA authorized it to award the plaintiffs damages for the taxes that went unpaid on the cigarettes that UPS illegally transported under those statutes. After calculating the amount of unpaid taxes due under both statutes, the district court concluded that it would award damages for unpaid taxes under the CCTA, which summed to a larger amount than the damages for unpaid taxes under the

---

[31] The district court also awarded $1,000 in nominal penalties under the CCTA. That award is not challenged on appeal.

PACT Act.[32]

However, because the district court thought of the plaintiffs' "lost tax revenues [as] a type of compensatory damage[]," *see United Parcel Service, Inc.,* 253 F. Supp. 3d at 687, it applied tort principles of causation to limit the plaintiffs' recovery of unpaid taxes by the amount of "tax diversion," or the extent to which purchasers of unstamped cigarettes would have purchased New York-taxed cigarettes if the former were not available through UPS. The court awarded the plaintiffs only 50% of the state and local excise taxes that went unpaid on UPS's cigarette shipments, reasoning that half of the purchasers of unstamped cigarettes transported by UPS would have managed to buy untaxed or lower-taxed cigarettes by some other means if UPS had complied with the law by declining those shipments.

On appeal, UPS argues that the district court erred in applying a diversion rate of 50%, instead of accepting the testimony of its expert, who opined that 94.6% of consumers whose unstamped cigarettes were delivered by UPS would

---

[32] The damages for compensatory damages were higher under the CCTA than under the PACT Act because UPS shipped more cartons of cigarettes in violation of the CCTA than it did in violation of the PACT Act (since only five of the Liability Shippers were on the NCLs).

still have evaded State and City taxes in a "but-for world" where the unstamped cigarettes shipped by UPS were unavailable. The plaintiffs cross-appeal on this point, claiming that it was error for the district court to apply any diversion rate at all to the plaintiffs' damages for unpaid taxes.

Determining the correct measure of relief under the CCTA and PACT Act is a question of statutory interpretation, which we review *de novo*. *See Gortat v. Capala Bros., Inc.*, 795 F.3d 292, 295 (2d Cir. 2015). A straightforward reading of both the CCTA and the PACT Act leads us to conclude that the proper measure of damages under either statute is simply the amount of unpaid taxes on the unlawful transactions UPS knowingly facilitated. The district court erred in importing tort principles of causation into that calculation.

The CCTA allows a state or locality in a civil action to obtain "appropriate relief for violations," including but not limited to "money damages" and "injunctive or other equitable relief," 18 U.S.C. § 2346(b)(2), which easily encompasses "unpaid taxes." The PACT Act allows a state or locality to recoup "damages, equitable relief, or injunctive relief . . . including the payment of *any unpaid taxes* to the appropriate Federal, State, local or tribal governments." 15

U.S.C. § 377(b)(2) (emphasis added).[33]

Of course, the State and City have to prove the existence of such "unpaid taxes." But nothing in the language of either the PACT Act or the CCTA suggests that "unpaid taxes" should be construed to mean the taxes that would have been collected not on the untaxed cigarette sales that actually occurred, but on the hypothetical transactions that would have occurred in some counterfactual

---

[33] The statutory basis for holding UPS liable for unpaid taxes distinguishes this case from *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010), on which the dissent relies. In *Hemi Group*, the Supreme Court cautioned against allowing the recovery of unpaid taxes from defendants who, like UPS, were never responsible for paying those taxes in the first place. There, the City sought to recover unpaid taxes under RICO, which provides a cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. 1964(c). The City asserted that it suffered injury in the form of lost tax revenue—its "business or property" in RICO terms—"by reason of" the Hemi Group's fraud, that is, its failure to submit customer information to New York State. *Hemi Group*, 559 U.S. at 7. The Court concluded that the City could not sustain its cause of action because the connection between the Hemi Group's failure to comply with its Jenkins Act reporting requirements (the predicate RICO offense) and the City's lost tax revenue was too attenuated. The case did *not* involve the concept of "diversion." Here, in contrast, the statutes at issue were enacted for the precise purpose of preventing sellers of cigarettes from evading the collection and payment of taxes, and explicitly or implicitly provided for the recovery of unpaid taxes as a form of relief for violations by common carriers. We have no quarrel with Judge Jacobs's assertion that the "Supreme Court's teaching [in *Hemi Group*] transcends the [RICO] context." Dissenting Op. at 16. But the Court's caution about permitting damages in the form of unpaid taxes against parties that are not themselves responsible for paying them surely cannot apply where Congress has authorized such relief.

universe. "Unpaid taxes" more naturally means the taxes that should have been charged on the *actual* transactions that occurred, but that were not paid.[34]

Rather than engaging in the required statutory analysis, the district court accepted a faulty analogy to tort principles. But the language of private tort actions is relevant here only to the extent that it accords with the texts and purposes of the CCTA and PACT Act. Those statutes, which Congress intended to meaningfully deter common carriers such as UPS from transporting untaxed cigarettes, and which are aimed squarely at evasion of state and local cigarette taxes, cannot fairly be understood to incorporate UPS's diversion theory. We have previously explained that "in an enforcement action, civil or criminal, there

[34] Surely no one would dispute that proposition if the defendant here were the actual seller-shipper of the cigarettes. Take the example of a Manhattan jeweler who pretends to ship jewelry to an out-of-state address to evade sales taxes. We would undoubtedly reject an argument that the jeweler should not be liable for the unpaid sales taxes on the theory that, if the taxes had been charged, the customer would have cancelled the purchase and bought the jewelry in New Jersey instead, obviating any harm to the City or State from the jeweler's failure to collect and transmit the proper sales tax. UPS in effect argues that it should not be held liable for the unpaid taxes it helped the shippers evade because it is only an aider and abetter, rather than the principal offender. But those who aid and abet or conspire in wrongful conduct are generally jointly and severally liable for the harm caused by that conduct, regardless of the degree of their participation or culpability in the overall scheme. *See, e.g.*, *Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529, 1536 (S.D.N.Y. 1985) (citing W. Prosser, Handbook of the Law and Torts 292–93 (4th ed. 1971)).

is no requirement that the government prove injury, because the purpose of such actions is deterrence, not compensation." *SEC v. Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012) (rejecting defendant's invocation of "proximate cause" tort principle in SEC enforcement action). And in any event, tort principles typically do not permit a defendant to avoid paying damages by arguing that another tortfeasor's (or even innocent party's) actions would have been sufficient to produce the claimed harm absent the defendant's tortious conduct. *See Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 429 (2d Cir. 1969).

The failure of UPS's argument is further demonstrated by the inherently speculative nature of the inquiry that it persuaded the district court to undertake. UPS faults the district court's 50% diversion rate as unsupported by any reliable methodology. We concur. At the same time, we also concur with the district court's well-founded rejection of UPS's expert witness's theory that 94.6% of cigarette purchasers would have either quit smoking altogether, found other methods of obtaining bootlegged untaxed cigarettes, or traveled to other states to buy cigarettes if deprived of access to home delivery of cigarettes from reservation sellers. No doubt some, or even many, purchasers would have found other means of feeding their addictions while avoiding taxes. But the extent of

such evasion is inherently unknowable, and a rule that requires a district court to engage in such a speculative enterprise is as impractical as it is unmoored to the statutory concept of "unpaid taxes."

Thus, we hold that the district court erred in applying a 50% "diversion rate" to limit the plaintiffs' damages for unpaid taxes. The plaintiffs are entitled to the full amount of the unpaid taxes on cigarettes transported by UPS in violation of the CCTA, totaling $17,356,458 for the State and $1,441,770 for the City.

C. **The District Court Abused Its Discretion in Awarding Per-Violation Penalties Under Both the PACT Act and PHL § 1399-*ll*.**

The final issue we must consider is whether the district court abused its discretion in imposing cumulative penalties on UPS under the PACT Act, PHL § 1399-*ll* and the AOD. At the outset, we note that we have already concluded that the penalties under the AOD must be reduced from $80.5 million to $20,000. *See supra* II.B.[35] That reduction obviates some of our concern with the district court's assessment of what were in effect treble penalties. But we are still presented with the question of whether the total penalty award that

---

[35] We have also raised the compensatory award for unpaid taxes to $18.8 million. *See supra* III.B.

remains—approximately $78 million under the PACT Act and another $78 million under PHL § 1399-*ll*—is excessive. We hold that it is.

In general, civil penalties are designed to punish culpable individuals, deter future violations, and prevent the conduct's recurrence. District courts have discretion in fashioning appropriate relief in civil enforcement actions to achieve these goals. *See Friends of the Earth, Inc., v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 192 (2000). A district court may exceed its discretion, however, when its decision—though not necessarily the product of legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions. *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009). In determining the amount of civil penalties, district courts are typically guided by a number of factors, including the good or bad faith of the defendants, the injury to the public, and the defendant's ability to pay. *See Advance Pharmaceutical, Inc.*, 391 F.3d at 399.[36]

Our assessment of the civil penalties in this case begins with the statutes

---

[36] In awarding statutory civil penalties, district courts are also constrained, at the outer bounds, by the Eighth Amendment's Excessive Fines Clause. *See United States v. Bajakajian*, 524 U.S. 321, 328 (1998). A civil penalty violates the Excessive Fines Clause if it is "grossly disproportional to the gravity of the defendant's offense." *Id.* at 337.

under which they were imposed. The PACT Act allows the district court to impose per-violation – that is, per-package – penalties on a common carrier for shipping packages for sellers identified on the NCLs. The PACT Act caps the penalty for a common carrier's first violation at $2,500 but increases the limit to $5,000 for any subsequent violations that take place within one year of a previous violation. 15 U.S.C. § 377(b)(1)(B). PHL § 1399-*ll* authorizes the district court to impose per-violation – that is, per-carton – penalties on a common carrier for each carton of cigarettes that the common carrier ships, capping the penalty for each violation at $5,000. *See* PHL § 1399-*ll*(5). The district court awarded the plaintiffs approximately half of the per-violation penalties authorized under both statutes, imposing on UPS, in effect, a $2,500 penalty for each violation of the PACT Act and another $2,500 penalty for each violation of PHL § 1399-*ll*. The district court's assessment of penalties was permissible under the statutory schemes because both the PACT Act and PHL § 1399-*ll* are silent regarding the maximum penalties that may be imposed against a defendant.

However, it is worth noting here that Congress rarely exercises its authority to establish maximum-authorized civil penalties. Rather, when Congress adopts legislation authorizing the award of civil penalties, it generally

leaves to the courts the job of fleshing out federal common-law rules governing the maximum aggregate size of penalties and punitive damages awards. Thus, the fact that the district court's penalty award is technically permissible under the statutory regimes at play does not necessarily mean that it is a reasonable penalty in all circumstances. Penalties cascading on a defendant from several different statutory regimes must be applied with great care when they result from one underlying set of bad actions.

The double counting of PACT Act and PHL § 1399-*ll* penalties here falls within the category of unreasonable penalties. UPS was punished under both the PACT Act and PHL § 1399-*ll* for what was largely the same underlying conduct. Specifically, because all of the NCL shippers, for which UPS faced PACT Act penalties, were also Liability Shippers for which UPS faced PHL § 1399-*ll* penalties, UPS faced double per-violation penalties at a rate of $2,500 for many of the same shipments.[37] That led the district court to impose penalties of $156

---

[37] The five shippers on the NCLs—Elliot Enterprises, Elliot Express/EExpress, Bearclaw Unlimited/AFIA, Indian Smokes, and Smokes and Spirits, for which UPS faced PACT Act penalties—were all also Liability Shippers for which UPS faced penalties. Indeed, the district court used the fact that certain shippers were on the NCLs to deem them Liability Shippers for purposes of PHL § 1399-*ll* liability. *See United Parcel Service, Inc.*, 253 F. Supp. 3d at 629 ("While the fact that [Elliot Enterprises] was located on an Indian reservation was alone insufficient to

million under the PACT Act and PHL § 1399-*ll* for what was, in essence, one set of impermissible conduct.

That double counting, among other factors, leads us to conclude that the penalties that the district court imposed on UPS are too high. We recognize that both New York and Congress take cigarette trafficking seriously, which is why several laws address the conduct for which UPS is being held liable. UPS holds a key position in the distribution chain and can have a meaningful impact in putting an end to the sale of unstamped cigarettes from reservation sellers to consumers throughout New York. But the $240 million penalty originally imposed by the district court, and even the $160 million penalty that remains in the wake of our correction to the district court's erroneous calculation of penalties under the AOD, is far too large a pill to swallow for the conduct at issue here. In so concluding, we revisit some of the factors that the district court considered in the first instance.

---

support a reasonable basis to believe it was shipping cigarettes, when that fact was combined with its presence on the November 2010 NCL and its presence in the Tobacco Watchdog Group letter, the question was not close."). Approximately 54% of the PHL § 1399-*ll* penalty award to the State was attributable to NCL shippers, and approximately 80% of the PHL § 1399-*ll* penalty award to the City was attributable to NCL shippers. *See* J. App'x at 507–18.

The district court was correct that UPS bears a high degree of culpability for the shipment of unstamped cigarettes, having flouted its obligations under the PACT Act and PHL § 1399-*ll*, as well as the AOD to which it assented in order to settle an earlier investigation. The court concluded that "*[n]umerous separate acts* by *numerous UPS employees* allowed *vast quantities* of unstamped cigarette shipments to be delivered to unauthorized recipients in New York." *United Parcel Service, Inc.*, 253 F. Supp. 3d at 690 (emphasis added). But, at the same time, UPS is not the primary wrongdoer here: the proscriptions against UPS shipping cigarettes are intended to prevent the actual cigarette sellers from evading taxes. It is worth considering that UPS itself "had no obligation to collect, remit, or pay" the taxes that were evaded. *Hemi Group*, 559 U.S. at 17.

We also consider the public harm caused by UPS's conduct. The district court concluded that the State and Congress have deemed the transport of cigarettes a public health issue, but that UPS, as the transporter, bears a lower level of culpability than other entities, such as the manufacturer or seller of cigarettes, for the public health issues caused by smoking. We agree with the district court that the effect of cigarette smoking on public health is substantial, but that the gravity of UPS's conduct is partially mitigated by the attenuated

109

causal relationship between its conduct and the public health consequences of smoking.

Another aspect of the public harm is, of course, the plaintiffs' lost tax revenue on the cigarettes whose untaxed sale UPS facilitated. But the harm to the public fisc here totaled, at most, $18.8 million. The aggregate penalty imposed by the district court amounted to approximately 13 times that financial loss, and even the penalties remaining after the correction of the AOD penalty amount to more than eight times the maximum tax lost. The penalty amount even more dramatically dwarfs any profits UPS made on the illegal cigarette shipments. *See United Parcel Service*, 253 F. Supp. 3d at 690; J. App'x at 1953–54 (estimating profits on all shipments for Liability Shippers from 2010 through 2014 at $475,000).

The analogous penalty under the federal Sentencing Guidelines for sentences for trafficking cigarettes under the CCTA sheds some light on these ratios. *See* U.S.S.G. § 2E4.1; *cf. Bajakajian*, 524 U.S. at 338 (considering the maximum possible sentence under the Sentencing Guidelines for comparable conduct). The Guidelines are particularly relevant here because they make clear that tax evasion is the principal conduct at which these statutes are directed, *see*

U.S.S.G. § 2E4.1, and are designed to avoid hyper-technical, per-violation penalty

calculations where the conduct at issue "involv[es] substantially the same harm."

U.S.S.G. § 3D1.2. The operative Guidelines permit the court to set a fine at up to

four times the amount of pecuniary loss caused.[38] *See* U.S.S.G. §§ 2E4.1, 2T4.1,

8C2.4(d), 8C2.6. Thus, under our reading of the Sentencing Guidelines, the $18.8

million in unpaid taxes lost by the State and City would permit a sentencing

court to impose a fine up to $75.2 million, a far smaller financial penalty for a

*criminal* violation than the district court imposed for a *civil* offense.[39]

---

[38] We do not suggest that the Sentencing Guidelines applicable to criminal CCTA violations set an outer limit on the penalties that can be imposed under a different, civil, statutory regime. We merely use the Guidelines as a useful cross-check on the reasonableness of the district court's cumulative penalty amount.

[39] Section 2E4.1, titled "Trafficking in Contraband Cigarettes and Smokeless Tobacco," provides that the base offense level for unlawful conduct relating to contraband cigarettes and smokeless tobacco is the greater of 9 or the offense level from the tax table in § 2T4.1 corresponding to the amount of the tax evaded. The tax table at § 2T4.1 indicates that the offense level is 26 for a tax loss of $18.8 million. Since the offense level from the tax table is greater than 9, we use 26 as the offense level. Section 8C2.4 instructs that, when sentencing organizations, the base fine is the greater of the amount from the offense level fine table at § 8C2.4(d) or "the pecuniary loss from the offense caused by the organization, to the extent the loss was caused intentionally, knowingly, or recklessly." § 8C2.4(a). Here, the latter of those amounts, $18.8 million of pecuniary loss, is the greater one, so that becomes the base fine. That base fine of $18.8 million would be multiplied by four, however, assuming a culpability score of 10 or more. *See* § 8C2.5 (culpability score of at least 10 for organization with 5,000 or more

Lastly, we note that the deterrent value of civil penalties here is lessened to some extent by the fact that UPS began increasing its efforts to comply with the AOD in the fall of 2013, and was "achieving actual compliance as of the date this lawsuit was filed on February 18, 2015." *United Parcel Service, Inc.*, 253 F. Supp. 3d at 617. Given such compliance, the district court's reasoning that "only a hefty fine will have the impact on such a large entity to capture the attention of the highest executives in the company," *id*. at 691, was flawed. UPS's efforts to pursue more aggressive compliance with the AOD as early as 2013 indicate that an award in the hundreds of millions of dollars is not needed to accomplish specific deterrence.[40]

---

employees if the court also finds "tolerance of the offense by substantial authority personnel was pervasive throughout the organization"); § 8C2.6 (indicating a minimum multiplier of 2 and a maximum multiplier of 4 for a culpability score of 10 or more). Thus, if UPS were facing criminal charges in federal court, the maximum fine the district court could have imposed would be $75.2 million. *See* § 8C2.7.

[40] It is also worth noting that the deterrent effect on other similarly situated carriers is limited. Only two other major carriers had AODs comparable to that entered by UPS. One, DHL, closed its domestic shipping business in 2008. *See* J. App'x at 779; 1995. The other, FedEx, faced a similar lawsuit but reached a settlement during the pendency of this appeal. *See* Order for Dismissal and Retention of Jurisdiction, *City of New York v. FedEx Ground Package Sys., Inc.*, No. 1:13–cv–09173–ER (S.D.N.Y. Jan. 15, 2019), ECF No. 631.

Thus, we conclude that the district court's duplicative $78 million penalty awards under the PACT Act and PHL § 1399-*ll* cannot be located within the realm of permissible decisions. One $78 million penalty appears sufficient to accomplish the goals of the PACT Act and PHL § 1399-*ll*, without nearing the boundaries of excessiveness.

Although we would typically vacate and remand a case when concluding that the district court abused its discretion in imposing a certain penalty or punishment, that need not be done in every situation, and the circumstances of this case counsel against remanding for further proceedings in this already extended litigation. First, the district court judge who ably handled this case below has retired from the bench and it would be burdensome and inefficient for a new judge to review the record and arrive at a new penalty calculation at this late stage. *See United States v. Ganci*, 47 F.3d 72, 74 (2d Cir. 1995) (refusing to remand sentence where it would be an "inefficient use of judicial resources" despite remand being the normal procedure under the circumstances). Moreover, the district court has already calculated the appropriate amount of damages under each statutory regime and we find no error in either calculation. We have carefully considered the record ourselves and conclude that $78 million is an

appropriate penalty. *See Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019) (concluding, after reviewing summary judgment materials in connection with appeal, that appellate court could order unsealing documents without requiring a remand).

The district court in the first instance could have awarded penalties under either statutory regime. In vacating one of the $78 million awards, we choose to sustain the award under PHL § 1399-*ll* and vacate the award under the PACT Act. We do so because PHL § 1399-*ll* addresses the conduct that both Congress and the State seek to stop: the shipment of unstamped cigarettes to consumers. The PHL § 1399-*ll* award reflects a steep price of $2,500 per carton of cigarettes that UPS actually shipped. It also incorporates penalties for violations with respect to each of the Liability Shippers, including those on the NCLs.

Therefore, we vacate the $78.4 million penalty award under the PACT Act and affirm the $78.8 million penalty award under PHL § 1399-*ll*.

## CONCLUSION

For the reasons stated above, we: AFFIRM the judgment of liability and attendant $78.8 million penalties under PHL § 1399-*ll*; AFFIRM the judgment of liability but VACATE the imposition of $78.4 million in penalties under the

114

PACT Act; AFFIRM the judgment of liability but MODIFY the award of damages

under the CCTA to $17.4 million to the State and $1.4 million to the City; and

AFFIRM the judgment of liability but MODIFY the award of penalties under the

AOD to $20,000 to the State. The judgment of the district court, as so modified, is

AFFIRMED.

DENNIS JACOBS, *Circuit Judge*, concurring in part and dissenting in part:

The majority opinion admirably recounts the history of this case and the dizzying contractual and statutory provisions that govern. I recount only what is necessary to understand my positions in dissent.

To collect revenue and reduce public health costs, New York State and the City of New York impose taxes on cigarettes, amounting (currently) to $43.50 per carton--doing well while doing good. Of course, those taxes are only effective insofar as they are actually collected, and both New York State and the federal government have passed statutes intended to curb tax evasion, including by the imposition of damages and penalties on common carriers that deliver cigarettes, of which UPS is one. The regulation of UPS is enforced, variously, by four potential sources of liability.

**I**

Enacted in 2000, New York's Public Health Law § 1399-*ll* makes it "unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier" to be unauthorized to receive untaxed cigarettes. § 1399-*ll*(2). Delivery to a home or residence creates a presumption of unauthorized delivery. *Id.* The PHL

authorizes penalties "not to exceed the greater of (a) five thousand dollars for each . . . violation; or (b) one hundred dollars for each pack of cigarettes shipped, caused to be shipped or transported in violation of [the PHL]." *Id.* § 1399-*ll*(5).

In 2004, the New York State Attorney General investigated UPS's compliance with PHL § 1399-*ll*, and found regular instances of violation. To settle the resulting dispute, in October 2005, UPS entered into an Assurance of Discontinuance (the "AOD") with New York. Broadly, the AOD forbids UPS from knowingly shipping untaxed cigarettes to consumers in New York State, and specifies certain compliance measures to be taken by UPS, including, for example, auditing suspect shippers and maintaining a list of shippers who have been caught selling untaxed cigarettes. The stipulated penalty is "$1,000 for each and every violation." S. App'x at 508.

Five years later, the Prevent All Cigarette Trafficking Act (the "PACT Act"), 15 U.S.C. § 375 *et seq.*, banned the mailing of cigarettes through the United States Postal Service, and placed further restrictions and reporting requirements on common carriers. Among other prohibitions, common carriers are forbidden from accepting any packages from shippers on a "Non-Compliant List" that is maintained by the U.S. Attorney General. 15 U.S.C. § 376a(e)(1). The PACT Act

2

authorizes penalties "in an amount not to exceed . . . $2,500 in the case of a first violation, or $5,000 for any violation within 1 year of a prior violation."  15 U.S.C. § 377.  Critical here, the PACT Act has an exemption from its penalties--and preempts any damages or penalties available under state laws--if "the Assurance of Discontinuance [AOD] entered into by the Attorney General of New York and United Parcel Service, Inc. . . . is honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers."  15 U.S.C. § 376a(e)(3)(B)(ii)(I).

The shipment of cigarettes is regulated by yet another statute.  The Contraband Cigarette Trafficking Act (the "CCTA"), enacted in 1978, makes it illegal "for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes," 18 U.S.C. § 2342(a), and defines "contraband cigarettes" as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found."  *Id.* § 2342(2).  The CCTA provides that "[w]hoever knowingly violates [the CCTA] shall be fined," but gives no guidance as to amount.  *Id.* § 2344.

3

In this case, filed in February 2015, New York State and the City of New York (together, the "plaintiffs") allege that, from 2010 to 2015, UPS violated the PHL, the AOD, the PACT Act, and the CCTA by knowingly shipping untaxed cigarettes to consumers in New York.  The district court found after a bench trial that UPS had violated each of the statutes, and awarded the following damages and penalties:

- $78.4 million in penalties for accepting packages from shippers on the Non-Compliant List, in violation of the PACT Act;

- $78.8 million in penalties for the knowing shipment of untaxed cigarettes, in violation of the PHL;

- $9.4 million in damages for the recovery of unpaid taxes on cigarettes shipped in violation of the CCTA;

- $1,000 in nominal penalties for violating the CCTA;

- $80.5 million in penalties for violating the auditing provision of the AOD.

The total combined award was a colossal $246.9 million.

4

## II

I concur in part with the majority opinion, because I agree with the majority's navigation of many of these difficult issues. Specifically, I agree that:

- the district court properly concluded that the AOD authorizes penalties for auditing violations;

- the district court erred in concluding that the AOD authorized per-package penalties for auditing violations, amounting to an $80 million award, and that the proper award is $20,000;

- the district court did not abuse its discretion in denying UPS's motion for Rule 26 sanctions;

- the district court did not clearly err in finding the package quantity and contents for the purposes of calculating damages and penalties; and

- the district court did not err by ordering the parties to submit post-trial damages calculations.

These conclusions by the majority are sound and well-reasoned.

I part company with the majority on two issues, and to that extent I respectfully dissent. *First*, I believe that UPS is exempted from the PACT Act, and that the PHL is preempted, because UPS has "honored" the AOD nationwide (within the meaning of the statute) by subjecting itself (implicitly and explicitly) to the AOD nationwide, and I therefore conclude that the district court erred in awarding damages and penalties under the PACT Act and the PHL. *Second*, I believe that the CCTA's definition of "contraband cigarettes" does not

5

permit aggregation of packages with fewer cigarettes to arrive at "a quantity in excess of 10,000 cigarettes"; and I further conclude that the district court erred in awarding damages under the CCTA without sufficient evidence to support the award.

**The PACT Act and the PHL**

It is a close question whether UPS is exempted from the PACT Act and the PHL is preempted. The wording of the statute offers little help. Nevertheless, the majority's proposed solution raises so many knotty problems that it cannot be right.

As the majority opinion explains, UPS is exempted from the PACT Act, and the PHL is preempted, if the AOD is "honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers." 15 U.S.C. § 376a(e)(3)(B)(ii)(I) (PACT Act exemption); 15 U.S.C. § 376a(e)(5)(C)(ii) (preemption of state laws). According to the majority opinion, UPS would "honor" its undertaking only by exercising sufficient care to prevent illicit trafficking. In my view, UPS "honors" the AOD so long as it subjects itself to the terms of the AOD throughout the nation.[1] *See* Black's Law Dictionary (defining

---

[1] The majority cites the phrase "to block illegal deliveries of cigarettes or smokeless tobacco to consumers" as evidence that the "honored" clause was

6

"to honor" as to accept an obligation as valid, such as when a bank honors a check). Thus one does not dishonor a contract by subjecting oneself to its terms of liquidated damages.

This interpretation of the statute achieves straightforward application of a nebulous term, as follows. If a state or locality other than New York sues UPS under the PACT Act, UPS is not obliged to invoke the exemption; but if it does, the plaintiff cannot obtain remedies under the PACT Act, and is limited to the somewhat lesser remedies under the AOD. The condition is that UPS can invoke the exemption only if it "honors" the AOD in any enforcement suits brought by any State or locality. It does so by forgoing certain potent defenses that would otherwise defeat such a claim: that states other than New York lack privity with UPS; that other states did not agree to be bound by the AOD; that the wording of the AOD references cigarette distribution in New York only; and that the AOD grants no "rights or privileges to any" non-party. In that way, the New York-centric terms of the AOD do not defeat or complicate the exemption term of the PACT Act, which post-dated the AOD by five years. Nor can UPS back out of its

_____

intended to involve a compliance inquiry. But "to" clauses are more commonly understood as statements of statutory *purpose*, not directives. *See Allison Engine Co. v. Sanders*, 553 U.S. 662, 668 (2008) (concluding that "to get a false or fraudulent claim paid by the government" is a purpose clause, not a condition).

7

obligation to honor the AOD nationwide: UPS's invocation of the PACT Act exemption in any single forum would operate to estop its invocation of defenses against the AOD in any other forum. And the undertaking expressly made in this case--to honor the AOD nationwide--has similar estoppel effect. *Pace* the majority's misconception that UPS would thus have a case-by-case power of election in every state.

Thus UPS honors the AOD nationwide by subjecting itself to the AOD's penalty provision. And at this point having already done so in New York, it has no other option but to honor it nationwide. Up *until* that point, UPS was subjected to *either* (i) the AOD or (ii) the PACT Act and local state laws--but not all three. This is a common-sense result that seems contemplated by the exemption in the PACT Act. The manifest design of the PACT Act is to allow and ensure the imposition of one penalty or another, not to stack penalty upon penalty based on whether the company devoted a sufficient (though undefined) level of care and attention to weeding out untaxed-cigarette parcels from the millions of parcels it delivers every day.

The majority's interpretation is that to "honor" means to conduct sufficient oversight to the interdiction of cigarette traffic, and to devote sufficient resources

8

to that effort. That interpretation is unworkable for several reasons. First, if the applicability of the exemption were to turn on success of its interdiction measures, no one (courts, common carriers, states, or municipalities) could know whether the exemption is applicable until vexed questions were sorted out in litigation. The exemption would then become ineffective, because UPS could not rely on it: UPS could only know after trial whether it had sufficiently "honored" the AOD to qualify. And if UPS is found to be out of compliance with the AOD (say, in Rabbit County), triplicative penalties pile up under two statutes and a contract, all of which regulate the same conduct. This is untenable; worse, it is unconvincing.

The statute provides no standard for deciding whether UPS honored the AOD in the way posited by the majority. Would a single breach of a reporting requirement caused by management indifference (or other priorities) render the exemption inapplicable? Given the millions of packages delivered each day, would a hundred failures of compliance a month render the exemption inapplicable? What if the common carrier materially breaches the AOD in one state, but complies in the other forty-nine? How likely is it that Congress intended the applicability of the exemption to turn on such baffling questions, or

9

that Congress intended hundreds of millions of dollars of penalties to be rendered based on open issues?  With no statutory guidance (or useful help from the parties), the district court created its own standard.[2]

The majority's preferred approach is internally inconsistent.  If, as the majority sees it, Congress intended UPS to lose its exemption if it breached the AOD, one must infer that Congress also intended the assessment of penalties from three sources for the same conduct in the event of noncompliance.  But, as the majority concludes, that result cannot be sustained: for that very reason, the majority has sharply reduced the judgment of $247 million.  To avoid stacking of penalties under the PHL, the AOD, and the PACT Act, the majority simply chooses one statute's penalties to apply (the PHL), and writes off the penalties under the PACT Act and the AOD.

The majority alludes to a problem of "announcement"--how will other States know whether UPS has agreed to subject itself to the AOD nationwide, so that those States can therefore look to penalties under the AOD?  But UPS has

---

[2] The district court concluded that the exemption is unavailable if "the effectiveness of UPS's policies [is] so compromised that these policies are not in fact in place."  S. App'x at 144.  This invention is nowhere in the statute; it is subjective and vague; and it would require a trial to decide what contract and what statutes govern the case.

10

made that very announcement here. When UPS invoked the exemption in the PACT Act in this case, and advocated for preemption of the PHL, it became bound by the AOD nationwide by virtue of judicial estoppel. Thus, if Idaho now sues, UPS will be bound by its representation in this lawsuit that the AOD is effective nationwide and therefore will lose the ability to interpose defenses to claims under the AOD; and Idaho will seek penalties under the AOD because it will be unable to seek penalties elsewhere. Problem solved.

As to penalties under the AOD, the district court awarded $80 million for auditing violations (reduced by the majority opinion to $20,000) and imposed no penalties for the knowing shipment of untaxed cigarettes. The only penalties awarded by the majority for that unlawful conduct fall under the PACT Act and the PHL, which (in my view) are subject to UPS's exemption and to federal preemption, respectively. The plaintiffs argue that, if (as I think) the penalty awards under the PACT Act and PHL cannot be sustained, substitute penalties must be levied under the AOD for the knowing shipments of untaxed cigarettes. UPS argues waiver, because the plaintiffs did not seek those penalties under the AOD at trial. *See* S. App'x at 385 ("Plaintiffs are not seeking penalties [for knowing shipments]--they seek penalties only for violations of the audit

11

obligation in ¶ 24 [of the AOD]."). The plaintiffs explain, however, that they were willing to forgo collection under the AOD only because it would result in a duplicative award, and that it did not waive its right to seek those penalties if they were *not* duplicative.

The waiver, if there was one, should be overlooked. UPS does not challenge the district court's findings that it knowingly shipped some untaxed cigarettes; and UPS admits that it should be bound by *either* the AOD or the PHL/PACT Act. Accordingly, I would vacate the awards under the PACT Act and the PHL, and remand with instructions to consider whether penalties are appropriate under the AOD for the knowing shipment of untaxed cigarettes. Based on the district court's findings of the number of untaxed cartons of cigarettes knowingly shipped by UPS, the penalties would amount to about $30 million--a quite considerable penalty for failure to monitor a minute fraction of the parcels shipped by UPS.

12

**The CCTA**

I dissent from the majority's award of damages under the CCTA because: (1) the district court erred in concluding that the CCTA permits aggregation of small shipments to reach the 10,000-cigarette threshold in the definition of "contraband cigarettes", and (2) the district court erred in awarding any damages under the CCTA because there was insufficient evidence to sustain the award.

The CCTA outlaws the knowing shipment of "contraband cigarettes," 18 U.S.C. § 2342(a), defined as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes." 18 U.S.C. § 2341(2). The district court ruled (and the majority agrees) that the CCTA permits aggregation of smaller quantities to meet the 10,000-cigarette threshold. That is a misreading. "A quantity," a singular noun, is read naturally to reference a single shipment of more than 10,000 cigarettes, which amounts to 50 cartons. This interpretation fits the express purpose of the statute, to address "the serious problem of organized crime and other large scale operations of interstate cigarette bootlegging." S. Rep. No. 95-962, at *3 (1978).

If aggregation is permitted (as my colleagues conclude), courts will be left to resolve difficult questions, starting with time period. The plaintiffs argue that aggregation should be permitted over the entire four-year period of the statute of limitations. Such aggregation would impose a penalty for shipping about one carton a month. This quick calculation tells us something about what Congress likely intended. Surely, organized crime has something better to do.

As to the calculation of damages under the CCTA, the majority concludes that the plaintiffs are entitled to recover the taxes they would have collected for each and every carton of untaxed cigarettes shipped by UPS. I disagree.

The issue is resolved by general principles of damages. In order to recover compensatory money damages, the plaintiffs must demonstrate that their loss of tax revenue was caused by the defendant's actions. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 52 (2d Cir. 2015) ("Compensatory damages are designed to place the plaintiff in a position substantially equivalent to the one that he or she would have enjoyed had no tort been committed."); *see also Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001) ("[Compensatory damages are] intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.").

14

Unlike the *sellers* of the cigarettes, who are directly responsible for

remitting the taxes to the state, UPS never had an obligation to pay the cigarette

taxes. The damages theory relies on UPS's role as a conduit--incidental to its

useful and legitimate business. No damages were caused by UPS failing to pay

the tax (it never owed any); any damage was caused by UPS transporting

cigarettes for sellers who did owe the taxes but failed to pay.

The intuitive point--that UPS was never responsible for paying the taxes

on the cigarettes--is critical in light of the Supreme Court's decision in *Hemi*

*Group, LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010). The City of New York

sued an online cigarette seller in New Mexico that shipped untaxed cigarettes to

consumers in New York City. Because it was an out-of-state seller, defendant

Hemi Group was under no obligation to charge, collect, or remit the City's tax on

those sales. The City argued under RICO that Hemi was liable nevertheless

because it failed to comply with a federal statute that required it to report

customer information to the state. The Court concluded that the alleged acts of

racketeering (violations of the federal reporting requirement) were attenuated

from the alleged damages (unpaid City taxes), and therefore could not justify

15

RICO recovery for the unpaid taxes. What matters for us is the Court's

observation in dismissing the City's claims:

> It bears remembering what this case is about. It is about the RICO liability of a company for lost taxes it had no obligation to collect, remit, or pay, which harmed a party to whom it owed no duty. It is about imposing such liability to substitute for or complement a governing body's uncertain ability or desire to collect taxes directly from those who owe them.

*Id.* at 17. We are thus cautioned against allowing the collection of unpaid taxes

from defendants who, like UPS, were never responsible for paying them in the

first place. True, *Hemi* was a RICO case; but the Supreme Court's teaching

transcends the context.[3]

The plaintiffs here are entitled to recover no more than the cigarette taxes

that would have been collected in the absence of UPS's illegal conduct. That

depends (as the district court ruled) on the "diversion rate," *i.e.* the percentage of

smokers who would have purchased tax-stamped cigarettes if UPS complied

with the law.

---

[3] The majority deems *Hemi* inapplicable to this context because the *Hemi* principle "surely cannot apply where Congress has authorized such relief." Majority Op. at 101 n.33. But Congress did not: the majority's preceding sentence asserts no more than that Congress did so "implicitly." In any event, the PACT Act does not apply for the reasons I set out above, and, as to the CCTA, the majority posits the payment of "unpaid taxes" only as it may be "encompasse[d]" in "money damages." Majority Op. at 100.

16

As UPS contends, the plaintiffs failed to sustain their burden of proving damages because they failed to offer any evidence of a diversion rate.

The district court's finding--that the diversion rate is 50 percent--comes from mid-air. The only testimony at trial on the proper diversion rate came from UPS's expert, Dr. Nevo; he opined that 5.4 percent was appropriate. The district court rejected Dr. Nevo's testimony (on a questionable basis), and then simply made up another rate:

> On balance, the Court cannot arrive at a precise number of cigarette cartons consumers would have purchased, but 50% is a reasonable number based on the totality of facts. The Court therefore finds plaintiffs are entitled to compensatory damages in the amount of 50% of Cartons . . . shipped by the Liability Shippers.

S. App'x at 442. In its entirety, that is the district court's analysis of the diversion rate. There is no citation to precedent or the record. And the plaintiffs offered no evidence at trial to support a 50 percent rate.

The plaintiffs argue that the 50 percent diversion rate is supported (more or less) by Dr. Nevo's opinion that 56 percent of all cigarette sales in New York State are taxed sales. But the district court did not predicate its 50 percent finding on Dr. Nevo's 56 percent estimate. In any event, Dr. Nevo's testimony-- that 56 percent of New York smokers buy taxed cigarettes--does not mean that

17

smokers who buy *untaxed* cigarettes shipped by UPS would buy *taxed* cigarettes in the same proportion as all other New Yorkers if their smokes could not be shipped by UPS.  The premise is untenable, given that many of those consumers are financially marginal, are likely to be price sensitive, and are unlikely to have an extra $3,000 a year for a carton-per-week habit.

Therefore, because the plaintiffs did not offer sufficient evidence to support its damages calculation, I would reverse the damages award under the CCTA.

\* \* \* \* \*

In sum, I vote to: vacate the penalty awards imposed under the PACT Act and the PHL; vacate the award of damages under the CCTA; reduce to $20,000 the penalty for auditing violations under the AOD; and remand to the district court with directions to calculate the reasonable penalties under the AOD for the knowing shipment of untaxed cigarettes.